BETHEL LEE WOLVERTON, a minor, by R. L. WOLVERTON, her father and natural guardian, v. J. M. KURN and JOHN G. LONSDALE, Trustees of the St. Louis-San Francisco Railway Company, a Railroad Corporation, Appellants.—156 S. W. (2d) 638.

Division One, October 30, 1941.

Rehearing Denied, December 12, 1941.

*E. G. Nahler* and *Ward & Reeves* for appellants.

*L. E. Tedrick* and *Phillips & Phillips* for respondent.

910

HYDE, C.—This is an action for damages for personal injuries. Plaintiff had verdict and judgment for $3000. Appeal was taken to the Springfield Court of Appeals which reversed and remanded the cause, but on dissent of one of the Judges (who considered outright reversal necessary) it was certified here. [Wolverton v. Kurn, 149 S. W. (2d) 62.]

Plaintiff's case was submitted solely upon humanitarian negligence. Defendants contend that no case was made for the jury. The following facts appear from ▆▆▆ the evidence considered most favorably to plaintiff. Defendants' train struck the wagon, in which plaintiff was riding, at a public road crossing. The railroad ran from southwest to northeast; the train was traveling northeast about 25 miles per hour. The wagon, in which plaintiff was riding, was pulled by a team of mules. (For description of the mules and other details see opinion of Court of Appeals, 149 S. W. (2d) l. c. 64.) Plaintiff's father (who was driving) and mother were sitting in chairs in the front of the wagon. Plaintiff and their other children sat on a board across the wagon bed behind them. As they traveled northeast along the public road parallel with the railroad, the train coming behind them whistled for the crossing (there was a section crew working near the crossing) and the mules began to run away. Plaintiff's father was able to hold them down to about 10 miles per hour. About 80 feet from the point where the mules began to run the public road turned north to cross the track. However, there was a private road, which continued northeast on the east side of the track, parallel with the track. Plaintiff's father attempted to drive the mules into this private road and did succeed in getting them to go a few feet beyond the point where the public road turned north. But when the mules were less than halfway across the intersection of these two roads, they turned sharply to the left, when only 50 feet from the track, throwing plaintiff's father and mother out of the wagon. They continued north across the track, in front of the train, west of the actual road

crossing (about 15 feet west of the center of this crossing) going over the rails west of the west end of the crossing boards. The engine struck the wagon at the left front wheel, throwing it off to the right (east) side of the track and injuring plaintiff. Plaintiff's father said: "When I was thrown out about fifty feet from the railroad, the train was about 160 to 200 feet from the point of contact."

Plaintiff's evidence tended to show that the brakes on the train did not actually begin to take effect until the wagon was struck. The only direct evidence as to the action of the brakes was the testimony of the engineer called as a witness by plaintiff. He said that, when an emergency application of the air brakes is made, it takes "about half a second from one car to the other." There were four cars in his train. He said the mules "weren't headed toward the crossing when I first saw them, but it appeared that they were going up the lane that led off to the right." He further testified: "When I saw the team turn towards the track I started the stock-alarm. At this time I was about 125 feet from the crossing. I kept giving these short blasts, and about 50 feet from the crossing I put on the air-brakes when I saw they were going on across the railroad. . . . I ran this 50 feet and 181 feet beyond the center of the crossing before I stopped." (For further details of the engineer's testimony see Court of Appeals opinion, 149 S. W. (2d) l. c. 65.)

Plaintiff's petition contained a charge of negligence concerning the whistling which frightened the mules, but did not request its submission. [See Sale v. Kurn, 341 Mo. 1157, 111 S. W. (2d) 98.] Of course,.plaintiff's position of imminent peril, under the humanitarian rule, did not begin until the mules turned suddenly to the left and headed for the crossing. Considering that they did not travel any faster, over this 50 feet, without a driver holding them back than they did before he fell out (which is a view very favorable to plaintiff), the train going 25 miles an hour (there is no dispute about that) traveled two and a half times as far as the team, between the time they started toward the track and the time of collision. Therefore, the train could not have been more than 125 feet from the point of collision when the team turned toward the track, throwing plaintiff's father out of the wagon. This is the basis of the opinion of the Court of Appeals and we think the only reasonable conclusion from the evidence. Any other distance would require a finding that the runaway team ran slower, without a driver, than they did with the driver holding them back, which would not have any support in the evidence.

The Court of Appeals ruled as follows:

"We think this evidence shows that the engineer saw the wagon without a driver when he was 125 feet from the crossing. He said he put on the air-brakes when he was 50 feet from the crossing. It

seems to be a question for the jury as to whether he could have avoided the collision, if he had put on the air-brakes when he saw the driverless team when the train was 125 feet back, at the time he said he started the stock alarm. If the brakes had been applied when he started the alarm, ▮ the speed of the train would have been slackened sooner, and if the slackening of the speed had been started 75 feet farther back, the wagon *might have had time* to cross the tracks before it was struck." (Our italics.)

We think this italicized phrase is the strongest statement warranted by the evidence. The trouble is that "*might* have had time to cross" is not enough, because it leaves the matter to speculation and conjecture. What is required to warrant a finding of humanitarian negligence (of the engineer) is evidence of facts from which it would be a reasonable inference that "the wagon *could* have had time to cross the tracks" and beyond the overhang of the engine "if the slackening of the speed had been started 75 feet farther back." In short, proof that the arrival of the engine (at the place where the wagon crossed) *could* have been delayed (by such action) for such time as was required for the wagon to get in the clear beyond the track. There was no such evidence. The only evidence as to stopping distance was the distance in which the train was actually stopped, namely: 231 feet from place of emergency application, which it was stated was a good stop. Thus application of the brakes 75 feet farther back would have only caused the train to stop with the engine 106 feet beyond the crossing. (Considering it took 50 feet for the brakes to take effect.) There is no basis in the evidence to determine how much it would have slowed down in an additional 75 feet (which would have been the first 75 feet after the brakes took effect) or how much longer it would have taken the engine to reach the point of collision. Certainly, the slackening of speed would be less in the first 75 feet than in the last 106 feet. Therefore, there was no substantial evidence to convict the engineer of humanitarian negligence on the theory that the speed of the train could have been sufficiently slackened, by emergency application of the brakes 75 feet farther back, to permit the wagon to clear by going on across the track. [See Meese v. Thompson, 344 Mo. 777, 129 S. W. (2d) 847, and cases therein cited.] We pointed out there that in our former decisions (discussed therein) "holding that a jury case on slackening was made, without evidence to show the amount of slackening possible within the distance available, there was a situation where the plaintiff's car barely failed to clear, so that only the slightest additional time would have been necessary for its escape." That was also the situation in both of the cases cited in the Court of Appeals' opinion. [Tharp v. Thompson (Mo. App.), 139 S. W. (2d) 1116; Smith v. Thompson, 346 Mo. 502, 142 S. W. (2d) 70.]

In the Tharp case, the train "struck only the rear end of the truck." There was also evidence that application of the brakes within 300 feet

of the crossing reduced the speed of the train from 55 to 40 miles per hour. It was held the jury was warranted in finding "that if the brakes had been applied 500 feet, or even 400 feet from the crossing, when plaintiff's peril was first discovered, the truck *would* have cleared." In the Smith case, the truck was struck 3 or 4 feet from the back end. Plaintiff's evidence showed that the brakes were not applied at all before the collision, either because "the enginemen failed to . . . discover the truck when it could have been seen" (in ʹperil) or that the fireman "saw the truck but did not warn the engineer." This court, from speeds and distances shown by the evidence (and from testimony that the brakes could have been operating for two-thirds of the time it took the train to cover the last 200 feet), held there was a jury issue on failure to slacken speed, saying: "This conclusion is based on the fact that the truck came so near to escaping and circumstantial evidence indicating the train *could* have been checked enough to let it get by." (Our italics.) This is not authority for submitting a case of only "*might* have had time to cross the tracks before it was struck."

The judgment is reversed. *Bradley* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.