WABASH RAILROAD COMPANY, Respondent, v. DANNEN MILLS, INCORPORATED, a Corporation, and VOLLEY BUNCH, Appellants, No. 45157—288 S. W. (2d) 926.

Court en Banc, March 12, 1956.

Rehearing Denied, April 9, 1956.

*William H. Becker, Robert C. Smith, Jr., William C. Frank* and *Russell D. Roberts* for appellants; *Clark & Becker* of counsel.

*Jayne & Jayne* for respondent.

[927]  HYDE, J.—Plaintiff sued for damages to its Diesel unit caused by a collision with defendants' truck. Defendant Dannen Mills counterclaimed for damages to the truck and defendant Bunch counterclaimed for personal injuries. Verdict and judgment was for plaintiff for $764.50 and against defendants on the counterclaims. Both defendants appealed.

The Kansas City Court of Appeals affirmed the judgment (Wabash R. Co. v. Dannen Mills, 279 S. W. (2d) 50); but on defendants' application we transferred the case because of the ruling by the Court of Appeals that defendants did not make a jury case on humanitarian negligence. Plaintiff submitted on primary negligence (failure to keep a lookout and driving upon the crossing when plaintiff's locomotive was on the crossing) without requiring a finding that the collision was not due to the humanitarian negligence submitted in the other instructions given at the defendants' request. (Plaintiff's humanitarian negligence was set up both as a defense and as the basis of the counterclaims.) By authorizing plaintiff's recovery on defendants' primary negligence and ignoring the humanitarian submission in instructions A and B as to which antecedent primary negligence was not a defense, instruction 1 was in direct conflict with instructions A and B and was prejudicial error for the reasons stated in the opinion of the Court of Appeals. (See also Scudder v. St. Joseph Belt Ry. Co., 338 Mo. 492, 92 S. W. (2d) 138; McGrath v. Meyers, 341 Mo. 412, 107 S. W. (2d) 792.) Therefore, the judgment must be reversed and the cause remanded unless we can sustain plaintiff's contention that no humanitarian negligence case was made.

Considering the evidence most favorable to defendants, as we must on this issue, we find the jury could reasonably have believed the facts hereinafter stated. Plaintiff's freight train of 76 cars was going north toward the crossing of Highway 11 (an east and west road) at between 30 and 40 miles per hour. The track was slightly downgrade to the north for about a half mile; but beginning about one-eighth mile south of the crossing it was upgrade. The track curved a little to the northwest for some distance south of the crossing (then back to the north) but the curve ended about 500 feet south of the crossing, so that from that point the track ran north across the Highway. At the time of the collision, it was raining and defendant Bunch said it was freezing on the side glasses so that he could not see out either side, but his defroster and windshield wiper kept the windshield clear. He said he was listening for signals as he approached the crossing but heard none. He said he was traveling about 40 miles per hour (his speed was more or less as he went over hills); that he looked south at a driveway about 500 feet east of the crossing but saw nothing at that point (he could see about 300 feet of the track through the windshield); that he then looked north as he passed the last

house 210 feet from the crossing; and that then seeing nothing he "just pushed down on the accelerator and let the truck roll on." The truck collided with the train, striking between the two diesels which were pulling it. Bunch said [928] (on cross-examination) that he increased his speed when he stepped down on the accelerator after passing the last house but he did not know how much; then he also said "it was supposed to pick up" when he pushed down on it but that he did not know whether it did or not. He said he was not coasting at that time.

Plaintiff's engineer, Henry D. Adams, said he first saw the truck (with a trailer attached) when it was about a quarter of a mile away from the crossing when his engine was coming around the curve, curving back to the north. He estimated its speed as 40 to 50 miles per hour (in a deposition he had said 60 to 70 miles per hour) but that its speed was fast for a truck and could have been around 60 miles per hour. He said he whistled then (about 800 feet from the crossing) and, after he completed the whistle, turned the bell on (about half a quarter from the crossing) but that the truck driver gave no indication of seeing the train or having any knowledge of its approach; and that he did not observe the truck slowing down during all the time he watched prior to the time it hit the train. He said the train was a little closer to the crossing than the truck when he first saw it; that he kept an eye on the truck right up to the time the collision happened and observed its entire path on that road up to the time of the collision; and that the truck driver never did show any evidence to him of knowledge of the danger. He said that about 800 feet away he became concerned about the driver's failure to respond and that was why he whistled there but that he did not apply his brakes until the truck hit the train; he "didn't deem it necessary to do that." (In the deposition he said that at 800 feet he thought the driver "had had a heart attack or was asleep or something.") He also said he first became concerned over the failure of this man to slow down about half a quarter of a mile away. He said, in the deposition, at that point "I was getting uneasy about it. I figured I was going to hit him or he was going to hit me or something." From the time he first observed the truck until it hit the train, he did not observe any slackening of the speed of the truck. He also said that if the emergency brakes had been applied 500 feet back from the crossing, it probably would have slowed the train down so that the truck could have got by in front of it; and that he believed it would. He applied the brakes when the collision occurred. The next whistle he gave (after whistling at 800 feet) was a nine second whistle for the crossing which began when the engine was 250 to 300 feet from it. He waited until that point so that this nine second whistle (two longs, a short and a long) would not be completed before reaching the crossing. He said this whistle was still sounding when he was on the

crossing. He said: "I whistled for the crossing, just usually, you naturally think they are going to stop and when you find out they are not going to stop, it is generally too late for anybody to do anything." At the trial he said he thought the truck would stop until it got within about 60 feet of the crossing. The fireman on the left (west) side of the engine did not see the truck until the engineer called his attention to it when the engine was very close to the crossing. He said the crossing signal was sounded but could not say how many feet south of the crossing it was started. The conductor in the caboose did not hear a whistle but said the cupola windows were closed. Defendants had other witnesses who were in the houses near the crossing and did not hear any whistle for this crossing, although a whistle was heard for the crossing one-half mile south. There was evidence that 32 cars had passed the crossing before the train was stopped. There was also evidence that such a train could be stopped in 12 or 15 car lengths but this was limited to stopping on an upgrade.

It is our view, on this evidence and the inferences the jury could reasonably draw from it, that defendants made a submissible case on humanitarian negligence. This is a case of discovered peril such as authorizes recovery on the stricter last clear chance rule. (See A. L. I. Restatement of Torts, Sec. 480.) There is no doubt that Bunch was actually oblivious and that plaintiff's engineer was aware of [929] his approach even before he reached a position of imminent peril. "In the absence of obliviousness, the position or danger zone of imminent peril of a person approaching the path of a moving vehicle reaches no farther beyond the direct path of such moving vehicle than the distance within which such approaching person is unable by his own efforts to stop short of it." (Lotta v. Kansas City Public Service Co., 342 Mo. 743, 117 S. W. (2d) 296, 300; see also Yeaman v. Storms, 358 Mo. 774, 217 S. W. (2d) 495; Hayes v. Coca-Cola Bottling Co., Mo. Sup., 269 S. W. (2d) 639.) Thus the greater the speed of the approaching vehicle, the wider the zone of imminent peril; but obliviousness (with reasonable appearances of obliviousness) widens it still farther. In such a case as this, the zone of imminent peril began and the duty of the engineer arose when it was or should have been reasonably apparent to him that the truck driver was oblivious of the approaching train and was intent on continuing across its path (Silver v. Westlake, Mo. Sup., 248 S. W. (2d) 628, 632 and cases cited); and it was his duty to act on reasonable appearances and at a time when action would be effective. (See Frandeka v. St. Louis Public Service Co., 361 Mo. 245, 234 S. W. (2d) 540, 547 and cases cited.) Commenting on this duty, while recognizing that usually an engineer is entitled to assume that one approaching the track with an unobstructed view has discovered or will discover the oncoming train, Restatement of Torts (comment b under Sec. 480) states: "However, it is not necessary that the cir-

cumstances be such as to convince the defendant that the plaintiff is inattentive and, therefore, in danger. It is enough that the circumstances are such as to indicate a reasonable chance that this is the case. Even such a chance that the plaintiff will not discover his peril is enough to require the defendant to make a reasonable effort to avoid injuring him. Therefore, if there is anything in the demeanor or conduct of the plaintiff which to a reasonable man in the defendant's position would indicate that the plaintiff is inattentive and, therefore, will or may not discover the approach of the train, the engineer must take such steps as a reasonable man would think necessary under the circumstances. If a train is at some little distance, the blowing of a whistle would ordinarily be enough, until it is apparent that the whistle is either unheard or disregarded. The situation in which the plaintiff is observed may clearly indicate that his inattention is likely to persist and that the blowing of the whistle will not be effective. If so, the engineer is not entitled to act upon the assumption that the plaintiff will awaken to his danger but may be liable if he does not so reduce the speed of his train as to enable him to stop if necessary."

The place where one comes into a position of imminent peril under the evidence in a particular case is a question for the jury to determine. (Harrington v. Thompson, Mo. Sup., 243 S. W. (2d) 519; Kelley v. St. Louis Public Service Co., Mo. Sup., 248 S. W. (2d) 597; Silver v. Westlake, Mo. Sup., 248 S. W. (2d) 628; Stith v. St. Louis Public Service Co., 363 Mo. 442, 251 S. W. (2d) 693.) We think the situation in this case is very similar to that discussed in the Teague cases. (White v. Teague, 353 Mo. 247, 182 S. W. (2d) 288; Teague v. Plaza Express Co., 354 Mo. 582, 190 S. W. (2d) 254; Teague v. Plaza Express Co., 356 Mo. 1186, 205 S. W. (2d) 563.) The situation in those cases was also one of discovered peril from observed approach of a motor vehicle at undiminished speed; and the speeds and distances involved were much like those shown in this case. Likewise, it appeared that slackening speed could have permitted the Teague automobile to pass through the intersection safely. In fact, we think this is a stronger case of observed appearances of obliviousness because, in the Teague cases, the casualty occurred at night when the approaching car could be observed only by its headlights. It is true that in the Teague cases, the other instrumentality involved was not a train but a truck which could have been stopped in 80 feet after the brakes took hold, so that there was a clearer case on slackening speed. Nevertheless, in this case, the engineer saw the truck driven [930] at undiminished speed toward the track on a cold rainy day (in February), when its windows would be closed, under such circumstances that he said gave no indication of the driver seeing the train or showing any evidence of the driver's knowledge of the danger and with no response to his first whistle. As said in the second

Teague case (190 S. W. (2d), l.c. 256): "If he (the driver) is apparently dominated by a fixed intent to pursue his course into the (train's) very path, he is no less in peril at any given time and place after such fixed intent becomes apparent than would be the case if he was aware of his predicament, but was physically unable to extricate himself." (See also State ex rel. Thompson v. Shain, 349 Mo. 27, 159 S. W. (2d) 582, 586.)

Did the engineer's duty to act commence when the engine was 500 feet south of the crossing? The engine was then less than 8½ seconds from it (if going 40 miles per hour) or about 9½ seconds if going 35 miles per hour; the truck was a second or less farther away depending on its speed. A case in which it was held the jury could have found that "9 seconds intervened between the apprehension of the danger and the time of collision" is Chawkley v. Wabash Ry. Co., 317 Mo. 782, 297 S. W. 20, 24. In that case, the fireman said he saw the automobile 200 feet from the track and immediately told the engineer to stop. We found there was ample evidence to show that the driver and the occupants of the car were oblivious of their peril "at a distance of 100 to 200 feet of the track" and that the fireman knew it. Both the train and the automobile were moving slower than in this case. A case in which it was held that an engineer's duty to act in a humanitarian negligence case did commence 500 feet south of the crossing at which a collision occurred is McCall v. Thompson, 348 Mo. 795, 155 S. W. (2d) 161. There the train was going faster, and the automobile slower, than in this case; but there the engineer said he "determined the automobile was not going to stop when the train was 500 feet or more from the crossing" and "then put on the emergency brakes" and whistled. However, there was evidence that the brakes were not applied at that time and also that, if they had been, the collision could have been avoided. We held the evidence sufficient "to make a case for the jury under the humanitarian doctrine on negligent failure to stop or slacken the speed of the train after the engineer realized that the driver of the automobile, by reason of apparent obliviousness, was in imminent peril from the approaching train." We also said the engineer was not entitled to assume that the automobile would stop, although it was beyond stopping distance from the track, because "the engineer, in his own mind and from his personal observation, determined that the automobile, by reason of the apparent obliviousness of its driver, was not going to stop and that its occupants were in peril from the approaching train." Certainly the jury could reasonably place that interpretation on the testimony of the engineer in this case and find that it did so appear to him when he was 500 feet south of the crossing. (See also Zumwalt v. Chicago & Alton R. Co., Mo. Sup., 266 S. W. 717 where the fireman said he knew there was going to be a collision when he first observed the automobile approach considerably beyond

the distance in which it could have been stopped; Alexander v. St. Louis-S. F. Ry. Co., 327 Mo. 1012, 38 S. W. (2d) 1023 where it was held a humanitarian negligence case was made on failure to slacken speed by action of the engineer between 365 to 435 feet from the crossing; Willhauck v. Chicago, R. I. & P. Ry. Co., 332 Mo. 1165, 61 S. W. (2d) 336 holding case made on failure to stop or slacken speed when plaintiff's peril could have been observed 600 feet from the crossing; Lynch v. Baldwin, Mo. Sup., 117 S. W. (2d) 273, where the fireman observed a truck going between 10 and 20 miles per hour 200 feet from the crossing and it was held a case was made on failure to warn, the speed of the train being 50 to 60 miles per hour; Bebout v. Kurn, 348 Mo. 501, 154 S. W. (2d) 120, where the engineer had a clear view for 910 feet and it was held a case was made on failure to stop; See v. Wabash R. Co., 362 Mo. 489, 242 S. W. (2d) 15 where it was held the jury could reasonably have found the truck was 11 seconds away [931] from the crossing and the train 1100 feet away when the truck driver's obliviousness became apparent.) In none of the above cases was the motor vehicle as far away in distance (although it was farther away in time in the See case) from the track, as was the truck in this case, when the engineer's duty was considered to have commenced (if the jury believed the evidence most favorable to defendants); but neither was the motor vehicle in any of those cases approaching at the speed of the truck in this case. However, the decisive question in this case as to when the engineer's duty (under the humanitarian rule) would begin is: What were the reasonable appearances of the situation as to the driver's obliviousness and his intent to continue into the path of the train? Considering the engineer's own testimony as to his observation of the approach of the truck, the appearances of the situation to him and his concern about the driver's conduct, together with his admission that an emergency application of the brakes 500 feet from the crossing could have permitted the truck to pass over it in front of the train, we cannot say as a matter of law that he had no duty to take such action at that time. We, therefore, hold there was a case for the jury on failure to slacken speed.

█ As to failure to warn, one defect in defendants' case is the lack of any evidence as to stopping distance of the truck at the speed it was traveling. However, from general knowledge of usual stopping distances, and the engineer's testimony as to his reliance upon such knowledge, we have no doubt that a sufficient showing to make a case on failure to warn can be supplied on retrial. Defendants did have substantial evidence that no whistle was sounded before the engine reached the crossing; and that, in any event, no adequate timely warning was given. Even the testimony of the engineer was that he did not whistle between the time of the whistle he said he made when on the curve; and first saw the truck, and the time when he started

the nine second crossing whistle. Certainly the jury could find that Bunch was in a position of imminent peril, requiring a warning, prior to the time they could find the regular crossing whistle was given, which the engineer said began between 250 and 300 feet from the crossing. It is true that the engineer said the bell was ringing during the last half-quarter mile of the approach to the crossing. However, the bell was not heard by the other witnesses and certainly the jury could reasonably have found that the bell alone was not an adequate warning. The brakeman in the engine at the time said the bell could not be heard inside the cab when the engine is working hard but that he could hear the whistle.

Plaintiff argues that Bunch was not in imminent peril and did not give any indication of obliviousness until he passed the driveway 210 feet from the track, at which point he said that, after looking north, he pushed down on the accelerator. Plaintiff says Bunch then gave the first indication of obliviousness by increasing his speed at that point. However, this ignores the engineer's testimony (which the jury could believe) concerning the high speed at which the truck was traveling; that such speed was never slackened; and that the appearances indicated to him an absence of any knowledge of the danger before the truck reached that point. Furthermore, Bunch said he was not coasting when he pushed down on the accelerator at that point and a picture in evidence indicates that the road from the driveway to the crossing was upgrade. Therefore, the jury could have found that more gas was needed to maintain the same speed to the crossing from that point. (This is a very different situation from that in Cable v. Chicago, B. & Q. R. Co., Mo. Sup., 236 S. W. (2d) 328 where the driver slowed down, practically stopped, changed gears and then moved forward.) Our conclusion is that defendants made a submissible humanitarian negligence case and are entitled to have a submission on proper instructions.

The judgment is reversed and the cause remanded. All concur.