Emmet Glenn FINDLEY, Alice Jean Findley, Nancy Fay Findley and Richard Allen Findley, Minors, by Their Legal Guardian, Joanna L. Thompson, and Jackie Leroy Findley, Respondents,

v.

Billy Max ASHER, Appellant.

No. 47531.

Supreme Court of Missouri,

Division No. 1.

March 14, 1960.

Rehearing Denied April 11, 1960.

Brown, Douglas & Brown, R. A. Brown, St. Joseph, for appellant Billy Max Asher.

Stephens & Thackery, Grant City, Ewing and Beavers, Maryville, for respondents.

HYDE, Presiding Judge.

Action for wrongful death of plaintiffs' mother from a skull fracture sustained in a collision of automobiles. Plaintiffs had verdict (by nine jurors) and judgment for $10,000 and defendant has appealed.

The case was submitted on humanitarian negligence on the theory that defendant "could have sufficiently slackened the speed of his said automobile and sufficiently changed the course" thereof so as to have prevented striking deceased's car. The principal question is whether a jury case was made under that rule of negligence on that hypothesis. Therefore, we will state the facts shown by plaintiffs' evidence and consider them from the viewpoint most favorable to plaintiffs. The collision occurred in Grant City at the intersection of Seventh Street (an east and west street) with U. S. Highway 169, running north and south. Seventh Street (32 feet wide) had a gravel surface and the Highway was paved with bituminous asphalt (20 feet wide), commonly called "blacktop", with shoulders five feet wide on the east and six feet wide on the west. There was a stop sign on the north side of Seventh Street 19 feet east of the east edge of the Highway pavement to stop westbound traffic approaching the Highway from the east on Seventh Street. Defendant was driving south, downhill, on the west side (righthand lane) of the Highway. Deceased came from the east on Seventh Street and was driving west across the intersection when the collision occurred west of the center line of the Highway and north of the center line of Seventh Street. The streets were wet at the time. According to defendant's evidence it was raining at the time of the collision. Plaintiffs' evidence was that it rained both before and after the collision but was not raining at that time. Seventh Street from the east was uphill to the Highway; 75 feet east the grade was 8%, increasing to 12% 50 feet east and to 16% in the last 25 feet going west to the Highway. As noted, going south on the Highway was downhill but the grade was not shown. There was a bank on the north side of Seventh Street with weeds on it and also weeds in a pasture to the north of Seventh Street, which interfered with defendant's view of Seventh Street from the Highway. However, plaintiffs' evidence showed that the view was not completely obstructed and that at least the upper

parts of cars on Seventh Street (as far back as 110 feet from the stop sign) could be seen from the Highway, at 365 feet north of the intersection; 160 feet east from 224 feet north and at least that distance from that point to the intersection. Both parties lived nearby and were familiar with the intersection.

Deceased was driving a 1953 two-door Chevrolet and defendant a 1951 two-door Hudson. The principal damage to the Chevrolet was on its right front, between the front door and the bumper, greatest around the right front wheel. After the collision the Chevrolet turned over and slid on its right side. It had very little damage directly in front. The principal damage to the Hudson was in front, mostly to the left front. After the collision it went through a ditch and struck a sidewalk. Both cars were in good mechanical condition before the collision, with good tires and good brakes. After the collision, and before leaving the scene, defendant estimated his speed at 25 miles per hour and deceased's speed at 20 miles per hour. Plaintiffs consider these speeds most favorable to them so we will consider the case on that basis. Defendant said he first saw deceased's car on the gravel moving near the stop sign; and that it could have been a few feet west of the stop sign or a few feet east of it; but that he thought then she would stop. Defendant said that deceased continued at the same speed from the time he first saw her until the collision occurred; and that when deceased did not stop he hit his horn, put on his brakes and tried to turn but did not know whether there was any effect from either before the collision. Defendant could not estimate how far he was from the intersection when he saw deceased's car pass the stop sign but said he was very near it. Plaintiffs had evidence of a test made with a 1953 Chevrolet (four door with two men in it) driven on Seventh Street west (uphill) toward the Highway, which showed a total stopping distance (including reaction time) of 55 feet, 11 inches; and it is plaintiffs' position that deceased's zone of imminent peril began at least at that distance from the point of the collision. Defendant says this test should not be considered because it was made under different weather conditions with a heavier car carrying more weight.

Plaintiffs make the following argument: "With defendant traveling at a constant speed of 25 m. p. h. and deceased traveling at a constant speed of 20 m. p. h., it is a matter of simple computation to find the location of defendant at the time deceased was at any given or particular point from the point of impact. At 20 m. p. h. the deceased was traveling at a rate of $29\frac{1}{3}$ feet per second. At 25 m. p. h. the defendant was traveling $36\frac{2}{3}$ feet per second. * * * Traveling at $29\frac{1}{3}$ feet per second, it would have taken deceased $1\frac{9}{10}$ seconds to cover the 55' 11". At 25 m. p. h. defendant traveled $36\frac{2}{3}$ feet per second and therefore, at the time the deceased entered the zone of peril (not considering obliviousness), defendant would have been $69\frac{2}{3}$ feet from the point of impact. Allowing, according to judicial notice, $\frac{3}{4}$ of a second for reaction time, defendant would have had $42\frac{1}{6}$ feet within which to slacken his speed or change his course by swerving. * * * The deceased did not need but a fraction (less than $\frac{1}{2}$) of a second to get through and clear the intersection. If the defendant had slackened the speed just a little to give deceased less than $\frac{1}{2}$ second more time, the collision would never have happened. If he had slackened his speed and swerved, she would have needed less time yet."

Defendant says that deceased was not in a position of imminent peril until it became apparent she was not going to stop at the stop sign. While that may be too broad a statement, it is true that defendant's duty, under the humanitarian rule, did not commence until he saw or by the exercise of the highest degree of care could have seen that deceased was oblivious of his approach and intended to proceed across

his path or that oblivious or not she was unable to stop short of his path. Frandeka v. St. Louis Public Service Co., Mo.Sup., 234 S.W.2d 540, 547, and cases cited. As also therein stated, it was his duty to act on reasonable appearances and at a time when action would be effective. What were the reasonable appearances of the situation that defendant could have seen at a time when he could have taken effective action? We start with what he did see, namely, he saw deceased's car going 20 miles per hour near the stop sign. Therefore the jury could have found that deceased's car was going 20 miles per hour at least a few feet east of it. Certainly the jury could have found that deceased was then oblivious of defendant's approach, both from her actions and because defendant said at the scene that she never did see him, although defendant said that when he first saw her car he thought deceased would stop. However, there must be both actual obliviousness and reasonable appearances of obliviousness to widen the zone of imminent peril beyond the distance in which deceased would have been unable to stop short of defendant's path. Turbett v. Thompson, 363 Mo. 577, 252 S.W.2d 319, 321. Plaintiffs' evidence showed that at the point where defendant first saw her car, deceased, even if she had then seen defendant, could not have stopped short of his path. Nevertheless, even if we assume deceased's car was going 20 miles per hour from a place 35 feet from the point of collision, the parties were then less than 1⅕ seconds from the point of collision and obviously, considering ¾ seconds reaction time, defendant (when less than 16½ feet would be left) could not have prevented the collision. The evidence does not justify a finding that defendant saw deceased's car farther back.

■ Should defendant, in the exercise of the highest degree of care, have seen deceased sooner and acted sooner? That is the issue upon which liability must depend in this case. Plaintiffs say it is a reasonable inference that deceased drove a considerable distance in approaching the Highway at least at 20 miles per hour because she was going up an incline and to be going 20 miles per hour at the top she must have driven at least at that speed at the beginning of the incline and all the way up. The stop sign was at the top of the incline which continued up to it with even a slight rise beyond it. However, even if that argument is accepted and he could have seen deceased's car coming up the incline at 20 miles per hour, defendant could properly assume that it would stop or at least slow down at the stop sign before entering the Highway. A speed of 20 miles per hour would not indicate recklessness, obliviousness or inability to stop at least until the car was close to the stop sign; and defendant also had the duty to keep a lookout ahead and for traffic from the west on Seventh Street. Furthermore, there is nothing in the evidence to show that deceased was not looking toward the Highway while approaching the stop sign. Because of the stop sign, defendant's duty to act under the humanitarian rule would not commence until, in the exercise of the highest degree of care, he could have seen deceased approaching so closely to the stop sign at such a speed that it would not be possible for her to stop short of his path, unless the reasonable appearances before that time were that she intended to disregard it. See Poague v. Kurn, 346 Mo. 153, 140 S.W.2d 13, 17; Smithers v. Barker, 341 Mo. 1017, 111 S.W.2d 47, 52. The trouble here is that there was no evidence to show what appearances were as deceased drove up the incline.

The decisive question is at what point could the jury reasonably have found that defendant's duty to act commenced. Plaintiffs cite Wabash Railroad Co. v. Dannen Mills, Inc., 365 Mo. 827, 288 S.W.2d 926. However, that was a case in which a truck approaching a railroad track at high speed was observed throughout its approach by the engineer whose own testimony showed that the reasonable appearances of the situ-

ation to him were that the truck driver was oblivious and intent on crossing the track. Wright v. Osborn, 356 Mo. 382, 201 S.W.2d 935, and De Lay v. Ward, 364 Mo. 431, 262 S.W.2d 628, and Williams v. Ricklemann, Mo.Sup., 292 S.W.2d 276, cited by plaintiffs, were cases in which a child ran across the road in front of the defendant's car. Likewise in Hendershot v. Minich, Mo.Sup., 297 S.W.2d 403, the evidence showed that the defendant saw a boy riding a bicycle toward the highway on which defendant was approaching. In all of those cases, there was time to act after the reasonable appearances of the situation indicated the position of imminent peril.

Plaintiffs also cite Liles v. Associated Transports, 359 Mo. 87, 220 S.W.2d 36; Frandeka v. St. Louis Public Service Co., Mo.Sup., 234 S.W.2d 540; Harrington v. Thompson, Mo.Sup., 243 S.W.2d 519; Wyckoff v. Davis, Mo.Sup., 297 S.W.2d 490; Perry v. Dever, Mo.Sup., 303 S.W.2d 1. However, none of those cases involved the situation of a person approaching a highway from a street on which there was a stop sign. In Hall v. Clark, Mo.Sup., 298 S.W.2d 344, the plaintiff had stopped at a stop sign and was struck in crossing the street thereafter. Even accepting plaintiffs' test that after reaching a point 56 feet from defendant's path on the Highway, deceased could not have stopped short of the point of collision (including reaction time), if going 20 miles per hour, we are faced with the proposition that there was no evidence of deceased's speed at that point. Furthermore, even if it would have required 56 feet to come to a complete stop, it would not have required that distance to slacken the speed of deceased's car sufficiently to have avoided a collision, so that if she had slowed down for the stop sign it would not have occurred. It is true that defendant said deceased's speed continued the same from the time he first saw her near the stop sign but there was no evidence to show whether or not she had slowed down before reaching the stop sign or at what speed she made her close approach to the stop sign. Deceased lived on Seventh Street (east of the Highway), was familiar with the intersection and went over it every day to go to her place of work. The stop sign had been there during the two or three years she lived on Seventh Street. Is it reasonable that, knowing about the stop sign and the Highway, deceased would approach it and go across it without slowing below 20 miles per hour at some point near it? However, reasonable or not, it seems to us to be wholly a matter of speculation and conjecture whether she did or not. Thus we do not know what defendant could have seen if he had looked 30 feet or more down the hill east of the stop sign when he was about 70 feet from the point of collision and our conclusion is that liability cannot be predicated on surmise and conjecture as to what he might have seen. A mere possibility of avoiding a collision is not sufficient to make a case under the humanitarian rule. Paydon v. Globus, Mo.Sup., 262 S.W.2d 601, 604; Claridge v. Anzolone, 359 Mo. 65, 220 S.W.2d 33; Yeaman v. Storms, 358 Mo. 774, 217 S.W.2d 495; Wolverton v. Kurn, 348 Mo. 908, 156 S.W.2d 638.

Plaintiffs further say that their evidence was sufficient to make a case on slackening and swerving under the "almost escaping rule." However, that rule has been applied only when a vehicle has been struck by a defendant's vehicle very near the end so that it barely failed to clear and the slightest slackening of the defendant's vehicle would have permitted escape. See Meese v. Thompson, 344 Mo. 777, 129 S.W.2d 847, 850, and cases therein cited and discussed; see also Hunt v. Chicago, M., St. P. & P. R. Co., 359 Mo. 1089, 225 S.W.2d 738. In this case, deceased's car was struck at the front, the most damage being at the front wheel, and so must have been struck almost as soon as the front part of it came into defendant's path. Even from the facts shown by plaintiffs' evidence, it would seem that if any party could have a jury case (humanitarian or primary negligence) it would be defendant who was traveling on a main Highway toward an intersection

protected by stop signs in plain view of the driver approaching uphill from the east.

The judgment is reversed.

All concur.