**Jennie Ruth REEDY, Respondent,**

v.

**MISSOURI–KANSAS–TEXAS RAILROAD COMPANY, a Corporation, Appellant.**

No. 48014.

Supreme Court of Missouri,

Division No. 2.

May 8, 1961.

Rehearing Denied June 12, 1961.

Lynn M. Ewing, Jr., Ewing, Ewing, Ewing, Carter & Wight, Nevada, A. E. Elliott, Nevada, for appellant.

R. S. McFarland, Nevada, for respondent.

STORCKMAN, Judge.

The plaintiff obtained a verdict and judgment for $17,000 against the defendant railroad company for the alleged wrongful death of her husband which resulted from injuries received when a truck driven by him was struck at a crossing by one of the defendant's railroad trains. The fireman of the locomotive was also joined as a defendant, but the jury found in his favor. The defendant railroad company is the only party which appealed. The parties will be designated as they were in the trial court, but the term defendant as here used will refer to the railroad company alone unless otherwise indicated.

In her petition the plaintiff charged both primary and humanitarian negligence. She sought to go to the jury on both theories, but the court refused plaintiff's primary negligence instruction, and the case was submitted on humanitarian negligence alone. The principal points upon which the defendant relies are: (1) that the court erred in refusing to direct a verdict in defendant's favor at the close of all the evidence because the plaintiff failed to make a submissible case of humanitarian negligence, (2) that the action of the jury in returning a verdict for the defendant fireman absolves the defendant from liability because it could be liable only if the fireman were negligent, and (3) that the court erred in giving plaintiff's verdict-directing instruction.

As a result of a pretrial conference, certain facts were stipulated by the parties. Among other things, it was agreed that on October 27, 1958, at about 7:00 a. m., the plaintiff's husband, Walter Guy Reedy, was driving his 1956 Ford truck in an eastwardly direction on the main street of Harwood, Missouri, where the street crosses three railroad tracks of the defendant; that the tracks run in a northeast and southwest direction, and the angle in the southwestern portion of the street and railroad intersection is approximately 60 degrees; that the west set of rails is known as the house track, the middle one as the passing track, and the one farthest east is the main line track; that as the Reedy truck was passing over the main line its right rear portion was struck by an unscheduled troop train being operated northeastwardly by employees of the defendant company including the defendant fireman Eldon Ray Garvey; and that as a result of the collision Mr. Reedy received injuries which caused his death on February 11, 1959. It

was further stipulated that Mr. Reedy was alone in the truck; that the speed of the truck when it was 100 feet west of the railroad crossing was 10 to 12 miles per hour; that the truck was 18 feet long; that the day was clear and dry and the sun was shining; and that there was a wooden crossarm warning sign near the crossing facing in a westerly direction bearing the words (as shown by plaintiff's photographic exhibits) "Railroad Crossing—Look Out For The Cars".

Pursuant to the pretrial agreement of the parties, plats prepared by them and pictures they had taken were inspected and marked as exhibits prior to the trial and were introduced in evidence without objection. The plats, plaintiff's Exhibit 1 and defendant's Exhibits 1 and 2, were drawn to the same scale and portrayed the various objects, their distances and dimensions in the vicinity of the crossing, particularly in the southwestern angle of the intersection which was on Mr. Reedy's right and fireman Garvey's left as they approached the crossing. All of the witnesses agreed that there were boxcars standing on the house track as alleged by the plaintiff in her petition, but plaintiff's witnesses were indefinite as to their number and location.

Along the west side of the railroad tracks, south of the crossing, there were fixed objects which partially obstructed the view of a motorist approaching the crossing from the west as well as the view of a fireman on a locomotive coming from the south. There is little or no dispute with respect to the nature of these objects and their location. They will be referred to generally since the evidence tends to show that the principal objects obstructing the view of the parties were boxcars standing on the house track. First, there is a sidewalk about 55 feet south of the center of the main street crossing. Where the sidewalk crosses a ditch or drain, about 75 feet west of the railroad tracks, there is a foot bridge with railings about 4 feet high.

Next, on the south, there is a truck ramp or hoist which is elevated only slightly above the ground surface. Then there is a grain loader 8 feet high and a coal house 9 feet high. There is another crossing, referred to in evidence as the south crossing, 363 feet south of the main street crossing. Just south of this second crossing, there is a small building 8 feet high. One of the more important buildings is a truck evacuator which is 18 feet high and located 437 feet south of the main street crossing and 50 feet west of the house track. In this area there is also a storage building 10 feet high and a poultry house 9 feet high. Extending between 609 and 681 feet south of the main crossing, and 35 feet from the house track, is Gammon's Grain Elevator which ranges from 20 to 35 feet in height. In addition to the objects mentioned, there are several utility poles, a tree, and some brush in the vicinity of the foot bridge over the ditch.

The defendant's evidence with regard to the number and location of the boxcars was more favorable to the plaintiff as affording an opportunity to discover Mr. Reedy's peril than the testimony of plaintiff's witnesses; the plaintiff resorted to it in undertaking to establish an extension of the zone of peril and a submissible case. There was a total of five boxcars, all located on the house track, two of which were south of Gammon's Elevator and could not have played any part in obstructing the view of the parties. The second pair of boxcars were on the house track opposite the unloading building or the truck evacuator. These boxcars occupied the portion of the house track approximately 400 to 490 feet south of the main crossing. The fifth boxcar was also on the house track and its north end was about 78 feet south of the center line of the crossing. The position of this boxcar, M-K-T 97099, is shown by the photographs which are plaintiff's Exhibits E and 13 and defendant's Exhibits A–10, A–11 and A–12. There were no cars on the passing track.

The train in question was running northeastwardly on the main line at a speed of 45 to 50 miles per hour. It consisted of a 3-unit Diesel locomotive and 14 cars of passenger equipment. The engineer seated on the right side of the cab of the locomotive was not in a position to see the Reedy truck until it came from behind the last boxcar and was upon the house track. The fireman, Eldon R. Garvey, seated on the left side of the cab, at an eye level of 13 to 14 feet above the ground, saw the Reedy truck on three occasions. The first time was "for a split second" through the space between Gammon's Elevator and the pair of boxcars at the truck evacuator at which time the truck was on the main street at or near the west side of a bridge or culvert approximately 120 feet west of the east rail of the main line track. The street at the place in question is surfaced with gravel. The elevation at the bridge is about three and one-half feet lower than that of the main line crossing. The bridge or culvert is practically covered with gravel and is over the same ditch or drain that the foot bridge spans, but there are no railings on the road bridge. The second time fireman Garvey saw the Reedy truck was through the opening between the pair of boxcars and the fifth or last boxcar. The third and last time was when the Reedy truck came upon the house track from behind the fifth and last boxcar. The truck was still traveling at 10 to 12 miles per hour. The fireman shouted to the engineer, "Big Hole it", which in railroad parlance means to apply the emergency brakes. The term has reference to the use of the largest opening in the air-brake system so as to permit the quickest and most forceful application of the brakes. The engineer testified that he saw the Reedy truck come from behind the last boxcar at about the same time that the fireman shouted and that he immediately applied the emergency brakes. At that time the front of the locomotive was something more than a hundred feet from the point of collision. The train came to a stop between 1100 and 1200 feet from

the place where the brakes were applied which was a "good stop". The construction of the locomotive was such that the engineer could not see an object in front of the locomotive unless the object was more than 100 feet away.

Mr. Reedy, aged fifty-four, had a mill or elevator on the west side of the tracks in the vicinity of the crossing. His eyesight and hearing were good and he was thoroughly familiar with the crossing. The truck was in good mechanical condition including the brakes. After the accident the windows of the cab were found to be closed. Some of the plaintiff's witnesses testified that they did not hear the train whistle or its bell ring, although some of them heard the roar and rumble of the train before it arrived at a place where they could see it. On the other hand, the defendant's evidence tended to prove that the whistle or horn was sounded for both crossings and was being blown at the time of the collision and that the bell was also rung. Whether the Diesel whistle was sounded presents the principal conflict in the evidence, but this does not appear to be the decisive factor in the case.

Plaintiff's instruction submitting the humanitarian doctrine required the jury to find that if Mr. Reedy "was driving his truck * * * *over the crossing in question,* and if you find that he and said truck were in a position of imminent peril and danger of being struck and injured by said train and that he was oblivious thereof, * * * *." Italics added. The defendant contends this instruction limits the zone of imminent peril to the time when the truck came behind the last boxcar onto the crossing and that there is no evidence justifying the extension of the zone of peril to a time prior thereto.

In its brief the defendant, by use of the plats and other evidence, undertook to demonstrate that after the Reedy truck came onto the crossing and from behind the last boxcar the collision could not have been avoided by sounding the Diesel horn and

applying the brakes. In her brief on appeal the plaintiff concedes that when the front end of the truck came upon the house track "it was too late to do anything" and "the collision was inevitable." Nevertheless, the plaintiff contends that the issues were properly submitted to the jury on the theory that the zone of peril began before Mr. Reedy reached the crossing. She asserts that when and where it began is a jury question but does not clearly specify the evidence which may reasonably be said to create a duty to act under the principles of the humanitarian doctrine.

The plaintiff's discussion of the evidence under this point is limited to one paragraph in her brief which can best be communicated by its recital which (at the expense of brevity) is as follows: "We think it would be fair to state that there were a number of objects south of the main street crossing in Harwood, that would obstruct the view of the enginemen and the driver of the truck. Neither of the parties could see the other until the train came from behind or south of the grain elevator. The first time the Fireman Garvey saw the truck he was able to estimate the speed of it when he was 720 to 680 feet from the crossing. The bridge mentioned in evidence (Plaintiff's Exh. 1) is in the same block as the crossing and 112 feet away from the center of the main line track; the next time Fireman Garvey saw the Reedy truck was at a distance of 490 feet from the crossing (Tr. 249); the truck still traveling at the same speed and 38.27 feet closer (2.6 seconds moving at 10 miles per hour or 14.7 feet per second) to the crossing when seen the first time; the evidence was that Fireman Garvey did see and observe the truck speed; that it had not been reduced; that there was a bed on the truck which was higher than the rear truck window; that the train was in effect approaching the truck from behind or at an angle of 60 degrees; that the coal house and loader were between the locomotive and the driver of the truck; that there was a box car farther down the track that would block

both their views, each of the other; that the fireman knew or should have known that the last box car sat in such a way that when the third and last time the truck came into his view that the front end of the truck was already over the house track (Tr. 251) *at which time it was too late to do anything.* It was 37 feet from the first rail west on the house track to the fartherest [sic] east rail on the main line track. The train occupied 5 feet of this distance plus a 2 foot overhang on that side, the front end of the truck was already over the house track which was at least 5 feet or more of the distance, the driver of the truck sits back of the front end of the truck 7 feet, it took 18 feet to stop, *which leaves no distance at all and the collision was inevitable."* Italics supplied.

In conclusion on this point, the "plaintiff urges that because of the known obstructions to the view, the defendant's advantage in the height from the same view, the apparent conduct of the plaintiff's husband in his approach to the crossing that it was a jury question as to when his position of imminent peril began, also for the jury as to whether or not he was oblivious to the approaching peril."

█ The operator of a motor vehicle about to drive across railroad tracks on which a train is approaching is required to exercise the highest degree of care for his own safety. Section 304.010 RSMo 1949, V.A.M.S.; Short v. Missouri-Kansas-Texas R. Co., Mo., 312 S.W.2d 50, 54 [2]. It is his duty when approaching a railroad crossing to use all reasonable precautions for his own safety and such duty requires him to look carefully in both directions and to listen for approaching trains at a suitable distance from the tracks and, if objects obstruct his view or his hearing is interfered with, he must meet these conditions by having his motor vehicle under such control that he can look and listen at a place where to do so would be effective. Short v. Missouri-Kansas-Texas R. Co., Mo., 312 S.W. 2d 50, 53–54; State ex rel. Hines v. Bland,

Mo., 237 S.W. 1018, 1019 [2]. Mr. Reedy could have stopped his truck within 18 feet allowing 12 feet for reaction time and 6 feet for stopping. The evidence and plaintiff's own calculations demonstrate that Mr. Reedy could have stopped or slowed down sufficiently after the last boxcar had ceased to obstruct his view and from a position of safety could have looked to the south and seen the approaching train. The driver's seat was about seven feet from the front of the truck. The distance from the west rail of the house track to the east rail of the main line is 37 feet. The plaintiff figured the distance between rails at five feet and the overhang of locomotive and cars at two feet. This is probably a liberal allowance since this court in West v. St. Louis-San Francisco Ry. Co., Mo., 295 S.W.2d 48, 52 [3], took judicial notice that the standard gauge of a railroad track is 4 feet 8½ inches and the overhang was fixed at 1½ feet. But using the plaintiff's figures and subtracting the width of the house and main line tracks at five feet each and a two-foot overhang on the west side of the main line and the same on the east side of the house track from the total width of 37 feet leaves a space of 23 feet from which Mr. Reedy could have safely observed the approaching train. The front of his truck would still have been at least 16 feet from its path. The photographs in evidence, especially plaintiff's Exhibits 7 and 8, as well as defendant's exhibits, are corroborative of such clearance. The photographs also demonstrate that there were no obstructions to prevent Mr. Reedy from swerving his truck to the northeast if he had looked and seen the train after driving onto the house track. While Mr. Reedy had this opportunity to avoid the collision if he had been observant, there was nothing the defendant could do to prevent the accident either by way of warning or slackening the speed of the train after the truck came into view the third and last time.

■ An engineer or fireman of a railroad locomotive upon seeing a motor vehicle approaching a crossing while such motor vehicle is still in a place of safety, and at such distance from the crossing as to allow the driver a reasonable time to stop before going upon the crossing and into the path of the train, is entitled to assume that the driver is not oblivious and will stop short of the path of the approaching train unless the driver shows some reasonable appearance of obliviousness. Janssens v. Thompson, 360 Mo. 351, 228 S.W.2d 743, 746 [2]; See v. Wabash Railroad Co., 362 Mo. 489, 242 S.W.2d 15, 21 [10]; Findley v. Asher, Mo., 334 S.W.2d 70, 73 [5].

■ The defendant's duty under the humanitarian doctrine did not arise until its fireman or engineer saw or in the exercise of ordinary care could have seen that Mr. Reedy was oblivious of the approach of the train and intended to proceed across its path or that, oblivious or not, Mr. Reedy was unable to stop short of its path. Findley v. Asher, Mo., 334 S.W.2d 70, 72–73 [2]; Cable v. Chicago, B. & Q. R. Co., 361 Mo. 766, 236 S.W.2d 328, 335 [5]; Frandeka v. St. Louis Public Service Co., 361 Mo. 245, 234 S.W.2d 540, 547; Borgman v. Crenshaw, Mo., 344 S.W.2d 134.

■ The decisive question is whether there is any fact or circumstance in evidence from which it can reasonably be said that the defendant's fireman in the exercise of ordinary care should have known that Mr. Reedy was oblivious of the approaching train prior to the time the truck emerged from behind the last boxcar or, in other words, at some time prior to the time the fireman's view of the Reedy truck was obstructed by the boxcar nearest to the crossing. The evidence in this respect must be viewed most favorably to the plaintiff.

The only witness who observed the truck as it approached the crossing was fireman Garvey. The plaintiff introduced as admissions certain testimony from his deposition and Mr. Garvey also testified as a witness in defendant's case. The first view fireman Garvey had of the Reedy truck is

not critical because it was fleeting and there is no contention that Mr. Reedy's obliviousness was discoverable at that time. Mr. Garvey saw the truck the second time when he could see past the two boxcars at the truck evacuator which would be about 490 feet from the main street crossing at which time the truck was "either on it or across" the road bridge. On this occasion he viewed the truck "in the neighborhood of 3, maybe 3 1–2 seconds" before it went out of sight behind the last boxcar. The plaintiff introduced evidence which tended to show that, if the emergency brakes of the train had been applied at the south crossing 375 feet from the point of collision, the truck without increasing its speed could have passed over the main line track ahead of the train. Therefore, the vital question is whether Mr. Reedy's obliviousness should have become reasonably apparent to fireman Garvey during this second interval.

When Mr. Garvey first saw the truck, it was traveling, according to his best judgment, at around 10 to 12 miles per hour and it continued to travel at that speed during the whole time that he was able to observe it. He observed that the truck was equipped with a grain bed. There was other testimony on behalf of the plaintiff that this bed was two and one-half feet high and covered the rear window of the truck. The interrogations to Mr. Garvey with respect to the height of the grain bed and his answers were as follows:

"Q. Was the grain bed up high enough that he couldn't see out the back window? A. I don't know.

"Q. Could you see a man in the truck? A. No, I wasn't looking at the man, I was just looking at the truck."

■ There was nothing to prevent the driver from looking to the southeast out of the window on the right side of the cab unless the angle at which the truck was approaching the tracks would be a hindrance. This angle was approximately one-third less than a 90-degree or a right angle approach. The plaintiff's own witnesses established that by leaning forward over the steering wheel Mr. Reedy could have looked out of the right window; and, if he had looked at the right time, he could have seen the train approaching in spite of the fact that the truck was approaching the tracks at a 60-degree angle. Plaintiff's expert witness, C. Gordon Ewing, a civil engineer and land surveyor who prepared the plat, plaintiff's Exhibit 1, testified that when the truck was on the bridge Mr. Reedy might have seen a train approaching 540 feet to the south if he had leaned forward and if there were no other obstructions than those shown on plaintiff's map. This testimony is consistent with the photographs and the maps in evidence. The photographs in evidence, especially plaintiff's Exhibits 5 and 6, demonstrate that Mr. Reedy could have seen the train approaching the crossing after it had passed Gammon's Elevator except to the extent where the boxcars obscured his view. The boxcar next to the crossing, being nearest to Mr. Reedy, was the principal obstruction to his vision. Until this boxcar interfered, some part of the train would have been visible to him due to the height and length of the train. The tracks run straight for a distance of at least a quarter of a mile south from the main street crossing. Since it was possible for Mr. Reedy to have kept a proper lookout in spite of the grain bed, it cannot be said that the mere fact that the truck was equipped with a grain bed should have put fireman Garvey on notice that Mr. Reedy was oblivious. The bodies of many trucks on the highways today are completely enclosed.

■ Excessive speed on the part of an operator of a motor vehicle is sometimes said to be indicative of his obliviousness and an intent to pass over a railroad crossing without stopping. In this case the speed was moderate and constant being 10 to 12 miles per hour. At this speed the truck could have been stopped in 18 feet and could have been slowed and turned

aside in a lesser distance. This could have been done while the truck was out of view behind the last boxcar or even after it went upon the house track. We find nothing in the rate of the speed of the truck or its operation during the second interval of observation that was reasonably indicative of obliviousness on the part of Mr. Reedy.

■ The plaintiff further suggests the fact that the last boxcar would block both their views should charge the fireman with knowledge that when the truck came into view again that its front end would be over the house track and it would be too late to do anything. The evidence does not show that the fireman knew beforehand that the boxcar was there and would block his view, nor that Mr. Reedy could not thereafter stop or turn aside. Moreover, the plaintiff does not assert that this should charge the fireman with notice that Mr. Reedy was oblivious and we cannot find that it did. As stated earlier, if objects obstruct the view of a motorist, he must meet these conditions by having his motor vehicle under such control that he can look when and where to do so would be effective and the enginemen have the legal right to assume that the motorist will do so until it becomes reasonably apparent that the driver is oblivious and will not or cannot perform his legal duty. The mere possibility of a collision and injury is not sufficient to create imminent peril and to invoke the duty to act under the humanitarian doctrine. West v. St. Louis-San Francisco Ry. Co., Mo., 295 S.W.2d 48, 51 [2]; Ornder v. Childers, Mo., 327 S.W.2d 913, 916 [3]. For example, a motorist on a through highway ordinarily has a general concern or apprehension that another approaching on an intersecting highway may enter the throughway without stopping. Such a possibility often exists, but it is not the kind of situation that invokes the humanitarian doctrine. The obligation to act arises when it is or should be reasonably apparent that the peril is certain, immediate, and impending. West and Ornder, supra.

The plaintiff relies strongly upon Wabash Railroad Co. v. Dannen Mills, Inc., 365 Mo. 827, 288 S.W.2d 926. The distinction made in Findley v. Asher, Mo., 334 S.W.2d 70, 73–74, applies in this case: "Plaintiffs cite Wabash Railroad Co. v. Dannen Mills, Inc., 365 Mo. 827, 288 S.W.2d 926. However, that was a case in which a truck approaching a railroad track at high speed was observed throughout its approach by the engineer whose own testimony showed that the reasonable appearances of the situation to him were that the truck driver was oblivious and intent on crossing the track." The engineer's testimony in the Dannen case tended to show a situation of discovered peril. The other cases cited by the plaintiff are likewise not controlling on the facts of this case.

■ There is no evidence from which it can be reasonably said that the fireman should have discovered that Mr. Reedy was oblivious to the approach of the train before he drove his truck onto the crossing at which time it was too late for the defendant to avoid the collision. Therefore, the zone of imminent peril was not extended and no submissible case was made. Findley v. Asher, Mo., 334 S.W.2d 70; West v. St. Louis-San Francisco Ry. Co., Mo., 295 S.W.2d 48.

The defendant urged that our review should be confined to the issues submitted in plaintiff's main instruction, Fowler v. Gulf, Mobile & Ohio R. Co., Mo.App., 286 S.W.2d 404, 408 [1], and that the plaintiff may not on appeal urge a new theory as to the time and place that Mr. Reedy came into imminent peril, citing Welch v. McNeely, Mo., 269 S.W.2d 871, 875 [3]. There is substance to these contentions, but our decision on the merits renders a consideration of these questions unnecessary. Nor do we reach for decision the other questions presented by the defendant.

The evidence was insufficient to make a submissible case and the trial court erred

in not sustaining the defendant's motion for a directed verdict.

Accordingly the judgment is reversed.

All concur.