Kathleen Marie MOORE, by her next friend, Raymond H. Moore, Appellant,

v.

Gary ERVIN and Leo William Steger, Respondents.

No. 49247.

Supreme Court of Missouri,

In Banc.

Jan. 13, 1964.

Frederick E. Steck, Sikeston, for appellant.

Finch, Finch & Knehans, Jack O. Knehans, James A. Finch, Jr., Cape Girardeau, for respondent Gary Ervin.

Jackson, Thomasson & Dickerson, Donald P. Thomasson, Cape Girardeau, for respondent Leo William Steger.

EAGER, Chief Justice.

Plaintiff, through her father as next friend, sought $300,000 in damages for serious personal injuries; she was nineteen years of age at the time of trial. The injuries were sustained in a head-on collision between the automobile in which she was a rear-seat passenger and an oncoming car. Several other persons were killed. At the close of plaintiff's evidence the trial court directed a verdict for defendant Ervin and the jury returned a verdict for defendant Steger. Plaintiff has appealed, contending that she made a submissible case against

defendant Ervin, and, as to Steger, that the Court committed errors in instructing the jury and in its rulings during argument. Steger's counsel, while denying all specific errors claimed, asserts in the first instance that plaintiff failed to make a submissible case against him. Ervin, through his counsel, supports the ruling directing a verdict for him.

The case was argued and submitted in Division One of this Court, and an opinion was filed on April 8, 1963. In that opinion the Court held that the trial court correctly directed a verdict for Ervin; it further held that plaintiff had made a submissible humanitarian case against Steger, and that it had erred in giving an instruction on Steger's behalf. Consequently, the judgment as to Ervin was affirmed, but the judgment in favor of Steger was reversed and the cause remanded. Judge Hyde dissented from that part of the opinion reversing and remanding the case as to Steger. We shall refer to that brief dissent later. The cause was transferred to the Court in Banc where it was again argued and supplemental briefs were filed. Where any references to the pleadings are necessary, they will be made in the body of this opinion. All negligence submitted was properly pleaded and, in fact, much more was alleged than was submitted.

This most unfortunate casualty occurred on Cape Girardeau County Road V; the road was blacktop, 22 feet wide, with no center line or warning signs and rather hilly. At the location in question the shoulder was only 2–3 feet wide on the west side, beyond that "about a foot of ditch," and beyond the ditch a steep bank 8 or 9 feet high. The date was July 5, 1959, Sunday, and the time was about 3:30 to 4:00 p. m.; the day was bright and hot and the road dry. About 1:00 o'clock on that day Paul Hahn, driving a 1953 Chevrolet and having Bill Hand as a passenger, picked up plaintiff and her sister June at their home. The ages of these young men are not shown. A stop was then made at the "Spot Cafe" in Cape Girardeau where Hahn

had at least two beers. Plaintiff left and went on two errands during that time. When the trip was resumed, they went by Hahn's home where apparently all but plaintiff put on swimming suits and all then left for a projected swimming place. This car was followed by one driven by Ross Dyer. On the way Hahn and Dyer stopped again and remained in some roadside place (undescribed) for ten or fifteen minutes. When the final leg of the journey started, Hahn was driving with June Moore and Diane Dyer in the front seat, and the plaintiff and Bill Hand in the rear, with plaintiff on the left side. Hahn proceeded thence north until the collision occurred.

The impact occurred near a crest in the road,—by measurement 18 feet to the south of it and 6–7 feet south of the edge of the farm driveway of a Mr. Hanebrink, who lived on the east side of the road. There was another crest in the road 705 feet to the south of the one just referred to; from the top of the south crest the view is unobstructed to the next one and the road inclines slightly as it proceeds north, but there is a dip or "swag" which creates a "blind spot" shortly before one reaches the crucial northerly crest. North of the latter (northerly) crest the road dips rather sharply for a considerable distance, then rises to another crest, all as shown by plaintiff's photographic exhibits and by the testimony.

Prior to this collision Hahn and his passengers were proceeding north behind a 1955 Ford Ranchwagon driven by defendant Ervin, who had one passenger. After passing the south crest described, Ervin was driving 35–40 (possibly 45) miles per hour, Hahn around 60; at a point described as from 225–250 feet south of the point of impact and while traveling about "60" (as related by plaintiff's witness Daugherty) Hahn started to pass Ervin's car; he increased his speed in order to pass and the cars traveled more or less together for about 150 feet; apparently Hahn's car never got quite even with Ervin's, though "fairly close." During this period both cars

were approaching the crest near the point of impact with Hahn entirely in the southbound lane; defendant Steger, driving a 1956 Chevrolet with five passengers, was approaching from the other (north) side of the crest. The witness Daugherty, who had been sitting in the Hanebrink front yard watching Hahn and Ervin, testified: that he "noticed another car coming up the hill" (Steger), so he jumped up, knowing that a collision was "inevitable," and ran into the house to call an ambulance; that there is a "blind spot" in the road that would hide the cars from each other; that Steger's car was roughly 100–150 feet north of the point of impact when he first saw it and its speed was about 35–40 miles an hour; that when he jumped up the Steger and Hahn cars were from 50 to 100 feet apart; that immediately before Steger got to the crest the Ervin car was "somewhere" slightly in front of or alongside the Hahn car, and that if Steger had swerved to the left he would have met the Ervin car head on; that only a "split second" elapsed from the time he (Daugherty) turned and started toward the house until he heard the impact.

· The plaintiff herself was able to add little to the facts thus related. She was (apparently) facing partially to her right, toward Bill Hand. She testified: that Hahn had speeded up and slowed down; she first indicated that this occurred "several times" while he was trying to pass, but she later testified specifically on cross-examination that he did so "when we were behind that car," and that on one such occasion he threw her off the back seat. She was somewhat vague as to whether she had seen the Ervin car as they were attempting to pass it, but finally stated that she saw it when "The front fender of our car was even with the rear fender of his car," just a "few seconds" before the collision, later stated as two or three seconds. She never saw the Steger car. She further testified that at some point Hahn said aloud, "Get out of the way up there you (omitting a 'dirty word') and let me pass"; it was first indicated that this statement was made "just before we hit," and later, just a "little bit" before the wreck, and also while Hahn was trying to pass. She did not note any application of brakes by Hahn; she testified that Hahn was driving "around sixty," but that it could have been between "sixty and sixty-five," that it was "too fast," and that his speed was faster than on any prior occasion when she had ridden with him.

A member of the Highway Patrol testified that the debris was in the southbound lane and that the impact was "all in the south bound traffic lane"; that the Hahn car left 81 feet of skidmarks, all of which were parallel with the (imaginary) center line except that the last two or three feet turned "toward" the other lane (with the angle or line not more accurately stated); that no skidmarks were found for Steger's car; that the cars were three or four feet apart, Steger's still headed south in its own lane, and Hahn's headed north but somewhat diagonally across the southbound lane; that because of the background and the topography, as the cars approached the crest the "Hahn car could see the Steger car better than the Steger car could see the Hahn vehicle." After sundry objections the witness was allowed to testify to certain stopping distances and reaction times which apparently were the combined result of experiments in which he had participated and the tables of the National Safety Council; these figures were not specifically applied either to a 1953 Chevrolet or a 1956 Chevrolet, nor did the results contemplate the use of a car with four or five passengers; hence the results are not entirely accurate or conclusive. However, the evidence is in the case for whatever it is worth, and the case should be decided on a broader basis than on objections to such evidence. This evidence was: that a 1958 Chevrolet with adequate brakes could be stopped at 40 miles per hour within 126 feet or less, 44 feet of which (three-fourths of a second) would be reaction time; that reaction time varied from three-fourths of a second to one and one-

fourth of a second; that at 60 miles an hour the total stopping distance is 251 feet; that various factors enter into stopping distances, including the load, the topography of the road, the size of the tires and brakes, etc.

Plaintiff submitted her case against Steger on alleged primary negligence in failing to keep a proper lookout and upon alleged humanitarian negligence in failing to slacken speed sufficiently to have prevented the collision. As developed throughout the trial, the specific humanitarian theory was that Steger could and should have slackened sufficiently to permit Hahn to turn back into the northbound lane. In support of that theory, it was shown that from a position in the southbound lane 132 feet north of the point of impact a photograph taken at four feet and four inches above the ground level (supposedly the approximate eye level of the photographer when seated in a car) would show the top, and only the top, of a Ford Falcon car placed in the same lane 147 feet south of the point of impact; also, that from the same vantage point a photograph showed the Falcon car down to the front bumper when it was placed 81 feet south of the point of impact. The photographer also testified that Steger was taller than he was.

Plaintiff introduced portions of Ervin's and Steger's depositions as admissions; the substance of Ervin's excerpts was: that he was, in some manner, conscious of the fact that Hahn was "coming around"; that he, Ervin, was traveling "right about forty miles an hour," that they traveled together for probably not more than a few seconds, and that he could not say that he actually saw the collision; that he turned in at the first driveway and came back. Steger's deposition testimony was: that he was driving from 35 to 40 miles an hour; that when he first saw the Hahn car he (Steger) was "O(h), around fifty feet [from it] I guess"; that the car which Hahn was trying to pass "went on down the road, I guess"; that he believed it had passed the point of collision at the time of the colli-

sion; and that the brakes of the car he was driving were in good condition. In so far as the testimony of Ervin and Steger might conceivably aid plaintiff's case we note the following from trial testimony. Ervin testified: that "right about the time of the impact or immediately before I realized that he [Hahn] was in the process of passing"; that when Hahn was "somewhere alongside" he saw the Steger car at less than 100 feet; that he first hit his brakes instantaneously and then applied the gas "to move out of the path of the collision * * it seemed the thing to do right at the time"; that a split second elapsed between the time he first saw Steger and the collision; that he did not know Hahn's speed. He pulled off into the Hanebrink driveway or yard. Steger testified: that he was driving at 35–40 miles an hour; that he had five passengers in his car; that he had come down a long hill and then up a grade; that when he was about 50 feet or a little farther from the point of collision Hahn's car came up over the hill and "before I had time to stop or even get my foot on the brake, he had hit me * * *."

Plaintiff's theory as to Ervin was that he was negligent in speeding up when he knew Hahn was trying to overtake and pass him, and in failing to slow down after he knew that Hahn was attempting to pass at a dangerous place. Counsel argue that the statement supposedly made by Hahn, to-wit, "Get out of the way you ——— and let me pass" created an inference that Ervin was speeding up and slowing down to prevent the passing; also, they urge the testimony that the cars traveled together for perhaps 150 feet as creating an inference that Ervin speeded up. The two inferences would be somewhat inconsistent. As to the first supposed inference, the contention is unsound because the plaintiff herself made it clear on cross-examination that Hahn's speeding up and slowing down occurred while he was *behind* Ervin and not while he was attempting to pass. As to the other contention, and as constituting our holding generally on the submissibility of the case

against Ervin, we adopt the following from the Divisional Opinion: "Appellant further points to testimony by the witness Daugherty to the effect that Hahn started to pass the Ervin car when Hahn was 225 to 250 feet from the collision point and that he saw the cars driving 'side by side' for about 150 feet. As we read Daugherty's testimony, he said he could not say the cars ever got 'side by side,' i. e., exactly even, but that the front of the Hahn car did get 'almost even' with the Ervin car, and he estimated that they traveled more or less side by side for 150 feet. Appellant contends that inasmuch as the Hahn automobile was going considerably faster than the Ervin car, and inasmuch as they traveled 'side by side' for 150 feet, the only reasonable inference is that Ervin must have accelerated to prevent Hahn from passing. The difficulty with that position is that it assumes, contrary to plaintiff's evidence, that Hahn continued at a speed of 60 m. p. h. for 150 feet rather than, as plaintiff's evidence showed, making skid marks or tire marks for the last 81 feet prior to the impact point in an attempt to stop as quickly as possible.

"Appellant contends further that Ervin knew that Hahn was trying to pass and knew that it was a dangerous place at which to pass. We have heretofore noted Ervin's testimony in those respects. He said that at some point he did realize that Hahn was trying to pass; that whether he got a glimpse of the car out of the corner of his eye or in his rear-view mirror, he did not know; that it did occur to him that it was a dangerous place to pass; that he then saw the approaching Steger car and, after an instant of indecision, accelerated to get out of the way. There was no evidence that Hahn ever gave any audible signal of his intention to pass in accordance with the requirement of Section 304.010 RSMo 1959, and V.A.M.S.

"We are of the opinion that there was no substantial evidentiary basis to sustain a reasonable conclusion that Ervin negligently accelerated or negligently failed to slacken. See Probst v. Seyer, Mo., 353 S.

W.2d 798, 802 [1–3]; Linneman v. Freese, Mo., 362 S.W.2d 585, 587 [2]. It follows that the trial court did not err in directing a verdict for Ervin at the close of plaintiff's evidence." And, we may add now, there was certainly no substantial basis in the evidence for a reasonable conclusion that any other or different action by Ervin, after he realized that Hahn was trying to pass, would have prevented the collision; in other words, there was and is no substantial evidence to show that any possible negligence of Ervin did or could have caused or contributed to the collision.

■ As to Steger, a somewhat different situation is presented, but the majority of the Court has determined, adverse to the former opinion, that no submissible case was made. Plaintiff's contentions on this aspect of the case are best stated in her reply brief (omitting transcript page citations): "Appellant's evidence showed that Respondent could have seen the Hahn car at least 132 feet from the point of collision; that his reaction time would have taken 44 feet; that he would have 82 feet within which to brake; that he never applied his brakes at all up to the point of collision; and that the Hahn car could have cleared the passing lane into the other lane in another one-third of a second." Next, counsel submitted certain factors which allegedly even decreased the stopping distance of 126 feet, and based thereon stated further: "Therefore, considered in the light most favorable to plaintiff, Respondent could have stopped 32 feet or more short of the point of collision. Appellant's evidence further showed that the Hahn car was in a controlled skid so the jury could very reasonably have found that if Respondent had slackened his speed, Hahn would have had time and opportunity to have released his brakes and returned to the Northbound lane, avoiding the collision." The actual location of Steger when he could first see Hahn's car is problematical, for, at best, this depends largely on where Hahn was. It seems that plaintiff's counsel and the photographer more or less arbitrarily se-

lected the sight distances based upon Steger's asserted stopping distance. When Steger was 132 feet from the point of collision traveling 35–40 miles per hour, Hahn, traveling according to all the evidence at 60 or more, was, in all probability, further back than the computed 147 feet from the point of impact; however, plaintiff has figured Steger's stopping distance on that basis. That theory and those measurements are based on the testimony of the photographer that the *top* of a car placed 147 feet south of the point of impact could be seen by Steger when he was 132 feet north. Thus, the difficulty with this formula and contention is that it assumes that Hahn was located 147 feet south when Steger was 132 feet north, that he reacted precisely at 147 feet, got his brakes applied in 66 feet and slowed to 40 miles an hour during the 81 foot skid; also, that this consumed the exact time necessary for Steger at 40 miles an hour to proceed 126 feet, or approximately two and one-fifth seconds. It is entirely apparent that in that period Hahn would have traveled a total of 198 feet except for such slowing as his braking may have accomplished; and with a required total stopping distance of 251 feet at 60 miles per hour (and more if above 60) it would seem most speculative to guess at his speed when he had traveled 147 feet. In other words, the inference that Hahn was 147 feet south when Steger was 132 feet north of the point of impact, the foundation upon which this theory was laid, is problematical at best; and the supposed fact that Steger could and should, as a practical matter, have seen the *top* of Hahn's car at that location is also problematical. All this leads to an inference, at least equally as reasonable, that Hahn was actually further away than 147 feet at the instant so chosen. And, moreover, it is a long stretch to hold that one should take warning and react instantly when the very *top* line of a car (and a white top at that) appears above the crest of a hill in one's lane against a bright July sky. We note also that plaintiff's Highway Patrol witness Logsden testified that on account of

the topography Hahn was in a better position to see Steger than Steger was to see Hahn; and that the evidence clearly indicated that Hahn had increased his speed when he attempted to pass, which would certainly alter his assumed position or positions. Thus, in our view, the making of a submissible humanitarian case of negligence against Steger is most doubtful, but we prefer to rest our ruling on the issue of causation.

It is entirely obvious that Hahn (in using his stopping distance of 251 feet) would have proceeded at least another 104 feet past the point of impact, even if he reacted at 147 feet to the south. Thus, there would have been a collision no matter what Steger did unless Hahn had turned into his own lane, for even on plaintiff's basic theory (of 40 miles an hour) Steger could only have stopped 6 feet short of the actual point of collision. Plaintiff's theory has been and is that "the jury reasonably could have found that if Steger had applied his brakes at a place 82 feet from the collision point (126 feet total stopping distance less reaction distance of 44 feet), he would have slackened his speed sufficiently to have enabled Hahn to have returned to the northbound lane behind the Ervin car, and thus and thereby have avoided the collision." The last 2–3 feet of Hahn's skidmarks "turned toward" the other lane, or "veered to the right" as the highway patrolman testified. There was no better or more complete description. We do not know the angle or curve, or whether that part of the skidmarks was of the same nature, appearance, width, etc., as the remainder. Based on this testimony, plaintiff contends, and the Divisional Opinion held, that such testimony "permits a reasonable inference that the Hahn automobile was not 'skidding' out of control but, on the contrary, its speed had been reduced to not in excess of 40 m. p. h. when it was three feet short of collision; that, under the circumstances, Hahn could have angled into the northbound traffic lane with safety so far as concerned the speed of his own auto-

mobile. * * * Hahn, traveling at about 40 m. p. h., needed about one third of a second to have moved into the northbound lane. Thus, it seems to us that the evidence supports the further reasonable inferences that had Steger applied his brakes when in the exercise of the highest degree of care he could have, the front of his automobile would have been considerably farther than six feet from the front of the Hahn automobile when Hahn began to move into the northbound lane and that the space between the Hahn and Steger cars would have been sufficient to have enabled Hahn to have safely reached the northbound lane in so far as concerned the presence and proximity of the Steger car." It is, we think, a rather violent assumption and not a reasonable inference that a driver in a skid which would require at least 185 feet of skidding to stop (and more if Hahn had, as generally indicated, increased his speed above 60) could, in one-third of a second while still skidding after 81 feet, and with an oncoming car almost upon him, turn into the other lane and avoid a collision. No part of Hahn's car *ever* reached the northbound lane even after the collision. Nor can we fairly infer that Hahn had reduced his speed to 40 miles an hour; the mere fact that the cars were 3–4 feet apart after the collision creates no such inference. Everyone who has driven a car and skidded realizes the almost total helplessness of a driver, even at lesser speeds than shown here. We may not infer Hahn's ability to control the car sufficiently to make a sudden, indeed instantaneous, turn. But there is another and wholly independent reason why a submissible case was not made on the issue of causation. Plaintiff's evidence, aided by any and all favorable inferences from the defendant's evidence, does not show that the space to Hahn's right (the northbound lane) was sufficiently clear that he could have turned, even had he been able. At no place is there substantial evidence to show that Ervin had cleared sufficiently to permit such a turn. Plaintiff only saw Ervin's car when Hahn's front fender was even with Ervin's rear fender, and she did not relate this fact to the relative speeds or to the specific time of the collision, so as to make it material. Daugherty (plaintiff's witness who was sitting in the yard) saw Hahn attempting to pass and speeding up, saw Hahn get "fairly close," but not exactly side by side, and saw the cars travel approximately side by side for about 150 feet. At no point did Daugherty, or anyone else, testify that Ervin pulled ahead so as to leave a clear space. Ervin testified (by deposition) that they traveled side by side for "a few seconds"—"less than a minute, definitely"; and (at the trial) that "right about the time of the impact" he realized Hahn was passing; that at the instant he saw the Steger car (at less than 100 feet) Hahn's car was "somewhere alongside the (my) station wagon"; that instantaneously he hit his brakes, but then applied the gas; that a *"split second"* elapsed between the time he saw the Steger car and the collision. Ervin turned into the Hanebrink driveway and the actual impact occurred about 5–6 feet south of it. The evidence simply fails to show, directly or by reasonable inference, that Ervin was sufficiently far ahead of Hahn during the critical moments to permit the latter to turn into the other lane. No one contends that Ervin's car was behind Hahn, so as to permit a successful passing. Plaintiff relies, in part at least, upon a statement read from Steger's deposition. Steger was asked, "assuming" that Hahn was applying his brakes, "What was happening" to the car he was trying to pass. Steger replied: "I couldn't say, it went on down the road, I guess"; he also added that he *believed* it had passed the point of collision at the time of the collision. Considered with all the other evidence, this vague testimony falls short of creating an inference that Ervin had proceeded fast enough and far enough to permit Hahn to *turn*, even if he had had time to turn before hitting Steger. Since the collision was entirely in the southbound lane, Ervin could have still been partially opposite the collision without suffering damage. We hold that there was no substantial showing that

this collision could have been prevented by a slackening of the speed of Steger's car. As said by Judge Hyde in his dissent in Division: "It is my view that the evidence leaves entirely to speculation and conjecture the matter of ability of Hahn to get out of the west lane in which he was driving abreast of Ervin's car in time to have prevented the collision, even if Steger had slackened speed as submitted."

The cases cited pro and con are applicable only as stating generalities. Plaintiff cites Shaw v. Griffith, Mo.App., 291 S.W.2d 230, 235, for the statement that it requires no proof to show that modern automobiles respond quickly and accurately to the touch of the driver's hand. Of course that is true, but the time and space required for a turn must still be available. Steger's counsel cite many cases which it will be unnecessary to review. Plaintiff is entitled to the benefit of all favorable evidence and to such reasonable inferences as are warranted by the evidence; but this means substantial evidence, and a humanitarian case which leaves one or more of the essential elements to speculation or conjecture "is not for the jury." Davis v. St. Louis Public Service Co., Mo., 316 S.W.2d 494. And see, generally, Berry v. Harmon, Mo., 323 S.W.2d 691; Bauman v. Conrad, Mo. App., 342 S.W.2d 284; Kirks v. Waller, Mo., 341 S.W.2d 860, 863; Probst v. Seyer, Mo., 353 S.W.2d 798; Pipes v. Missouri Pacific R. Co., Mo., 338 S.W.2d 30, 36. In Yeaman v. Storms, 358 Mo. 774, 217 S.W.2d 495, and Claridge v. Anzolone, 359 Mo. 65, 220 S.W.2d 33, the court indicated that it would not attempt to conjecture on what might be done in "split" seconds or fractions of a second in humanitarian cases. In Yeaman, supra, at loc. cit. 498 of 217 S.W.2d, the Court said: "Should we attempt to adjudicate negligence even under the humanity theory when, of necessity, it must be based upon variable surmises as to what may or may not have been accomplished in two-thirds of one second, a little more or a little less?" In Wilson v. Toliver,

Mo., 305 S.W.2d 423, the Court said at loc. cit. 431: "After the Jones car passed the point where he could safely turn to his right, it is wholly unlikely that either driver could do anything to avoid the collision. Allowing for deceleration that may have occurred after the brakes were applied, the accident probably occurred within two seconds or less after the Jones car entered the intersection. Then each of the parties was 136 feet from the collision point and traveling at the rate of 73 feet per second. We recognize that in the last 50 feet when the cars were skidding, effective turning was impossible and the drivers at best could only veer slightly from their respective courses. Neither can be charged with a failure to do more than he did in the last 50 feet." In Findley v. Asher, Mo., 334 S.W.2d 70, at loc. cit. 74, the Court said: "A mere possibility of avoiding a collision is not sufficient to make a case under the humanitarian rule. Paydon v. Globus, Mo. Sup., 262 S.W.2d 601, 604; Claridge v. Anzolone, 359 Mo. 65, 220 S.W.2d 33; Yeaman v. Storms, 358 Mo. 774, 217 S.W.2d 495; Wolverton v. Kurn, 348 Mo. 908, 156 S.W.2d 638." See, also: Shaw v. Griffith, Mo., 291 S.W.2d 230. And that principle is certainly applicable on the issue of causation, an essential element of a humanitarian case.

We hold that plaintiff made no submissible humanitarian case against Steger. In view of our ruling it is unnecessary to consider any of the specific errors which plaintiff asserts. Kirks v. Waller, Mo., 341 S.W.2d 860; Brooks v. Stewart, Mo., 335 S.W.2d 104, 81 A.L.R.2d 508. Although plaintiff submitted Steger's alleged failure to keep a proper lookout as a charge of primary negligence against him, the jury found for Steger on this submission and plaintiff has made no point here of error in that submission. The charge of primary negligence has been abandoned. Moreover, our holding of no submissible case on the element of causation is applicable to the primary submission as well as to the humanitarian submission.

■ The judgment in favor of both defendants is affirmed. We note, however, a technical insufficiency in the form of the judgment in that the trial court: "hereby orders judgment rendered for all the defendants and against plaintiff." The defect was one which was subject to correction nunc pro tunc. Since we are authorized by Section 512.160 RSMo 1959, V.A.M.S., to give such judgment as the trial court "ought to have given," we now render and enter here the following judgment: "It is therefore ordered and adjudged that plaintiff take nothing in this cause, either as to defendant Ervin or defendant Steger, and that each and both such defendants go hence, and recover their costs, for which execution shall issue."

All concur.