Mona May SIMMONS, Plaintiff-Respondent,

v.

Ralph W. SHOMER, Defendant,

and

Murl Lee Jones, Defendant-Appellant.

No. 8390.

Springfield Court of Appeals.

Missouri.

Oct. 12, 1965.

Meredith B. Turner, Kenneth H. Reid, Stewart, Reid & Turner, Springfield, for defendant-appellant.

Arkley W. Frieze, Vernie R. Crandall, Frieze & Crandall, Carthage, for plaintiff-respondent.

HOGAN, Judge.

This is an action for the wrongful death of plaintiff's husband. The plaintiff joined both defendant Jones, operator of the vehicle in which the deceased was riding, and defendant Shomer, operator of the vehicle with which the Jones car collided. Verdict and judgment were in favor of the plaintiff and against defendant Shomer in the sum of $12,000, but in favor of defendant Jones. Upon plaintiff's motion, the trial court set the judgment aside and granted plaintiff a new trial as to both defendants, in each case upon discretionary grounds. Though we take it that in this situation both defendants were entitled to appeal, Quinn v. St. Louis Pub. Serv. Co., Mo., 318 S.W.2d 316, 321 [6], only defendant Jones has done so.

Shortly before 10:00 P. M. on July 6, 1962, defendant Jones, accompanied by the plaintiff's husband and another companion, was driving north on the east side of Highway 39 at a point approximately seven-tenths miles south of the intersection of Highway 39 and Route FF in Lawrence County, Missouri. The road at this point is downgrade, and shortly after he "crested" or crossed the highest point on the hill, slightly south of the point of collision, defendant Jones met and passed a third, southbound, vehicle (referred to as the Buus car) behind which defendant Shomer was driving, wholly without lights. Immediately after defendant Jones passed Mr. Buus, the Jones and Shomer vehicles collided violently in the east or northbound lane. Both defendants and Mr. Simmons received injuries, and it is conceded that Mr. Simmons' injuries caused his death.

Plaintiff's petition was framed generally upon the theory that the two defendants, Jones and Shomer, were jointly and concurrently negligent, and the plaintiff alleged many acts of negligence on Jones' part. The esssential basis of plaintiff's case against Jones was, however, that Jones had caused the collision, or contributed to cause it, by blinding the oncoming (Shomer) vehicle with his lights, in violation of Section 304.370.[1] The case was finally submitted against Jones on humanitarian negligence in failing to "cease" blinding Shomer, to give warning by dimming his lights, and in failing to slacken or turn aside, and upon primary negligence in driving and operating his automobile with his lights on high beam when Shomer was within 500 feet. All other assignments were of course abandoned. Brooks v. Stewart, Mo., 335 S.W.2d 104, 105, 81 A.L.R. 2d 508; Guthrie v. City of St. Charles, 347 Mo. 1175, 1182, 152 S.W.2d 91, 93 [1].

The essence of appellant's position in this court is that the trial court erred in granting plaintiff a new trial as to him in particular because there was no evidence adduced from which it could reasonably be inferred that any negligence on his part was a proximate, contributing cause of the collision. The new trial as to defendant Jones was granted on the discretionary ground that the verdict was against the weight of the evidence, and it is true, as

---

1. References to statutes are to RSMo. (1959), V.A.M.S. and V.A.M.R.

the respondent says, that a ruling on that ground will not be disturbed on appeal if there is substantial evidence to support a verdict for the party to whom a new trial is granted. Schmidt v. Allen, Mo., 303 S.W.2d 652, 659 [19, 20]. However, it is also true that causation is an essential element either of a humanitarian case, Moore v. Ervin, Mo., 374 S.W.2d 142, 149 [4], or a primary case, Gaffner v. Alexander, Mo., 331 S.W.2d 622, 628 [5], and even concurrent negligence must be shown to have been a proximate cause of the injury. Reed v. Shelly, Mo.App., 378 S.W.2d 291, 301 [22]; 38 Am.Jur. Negligence, Section 64, pp. 718–719. And if, upon the whole record, considering the evidence in a light most favorable to the plaintiff and giving her the benefit of all reasonable inferences to be drawn therefrom, the plaintiff made no submissible case upon the issue of causation, the order granting her a new trial as to defendant Jones is erroneous and must be set aside. Rose v. Thompson, 346 Mo. 395, 401–402, 141 S.W.2d 824, 828–829 [3] [4, 5]. A careful consideration of the record convinces us that the decisive issue in this case is whether in fact the evidence justifies the inference that there was a causal relation between the defendant's acts, charged and submitted as negligence, and the injury sustained, or whether the casualty would have occurred, regardless of defendant's conduct.

This tragic casualty, as we have said, occurred on Highway 39 in Lawrence County. The date was July 6, 1962, and the time was shortly before 10:00 P.M. The road is a blacktop highway approximately 20 feet wide, runs north and south, and is marked in the center by a black and white line. The shoulder on the east side of the pavement is approximately six feet wide, and there is a "drop-off" from the shoulder, which is not literally vertical but is rather steep, some two or three feet deep.

To establish the location of the collision and the general lay of the land, the plaintiff introduced several photographic exhibits, the testimony of a photographer, and the testimony of two members of the State Highway Patrol who were present shortly after the collision. Generally, it was shown through the exhibits and the testimony of these witnesses that the two defendants' vehicles collided head on on the east side of the highway between the crest, or high point, of a hill south of the place of collision and a gentler rise, or "knoll," to the north.

Trooper Harold Stephens, called by the plaintiff, testified: That in response to a radio report he arrived at the scene of the casualty at about 10:00 P.M. Trooper Stephens located the point of collision as being on Highway 39 (which runs north and south) seven-tenths miles south of county road "FF," which runs east and west. The two damaged vehicles were located in the northbound lane on the east side of the highway at a place "in a westerly direction" from a utility pole on the east side of the right-of-way, which the witness had located as a reference point. Measurements had been made by this witness in connection with a criminal action against Mr. Shomer, and these measurements generally established the distance from the "approximate top of the crest" of the hill (south of the place of collision) to the utility pole as being 279 feet and the distance from the same point to the crest of the knoll to the north as being 531 feet. The witness also testified that from the point of collision, looking back to the south, one could not see the crest of the hill, but he also testified that there was no obstruction to a motorist's view from the crest of the hill (to the south) to the crest of the knoll. By referring to the photographic exhibits. Trooper Stephens located the point of impact as being approximately in the center of the east lane, 279 feet north of the crest of the hill.

On cross examination, and again by reference to photographs, Trooper Stephens testified that from south to north the grade is uneven and that there is a "bump or hump" in the grade, creating a "blind spot" for a northbound driver in which oncom-

ing traffic would be momentarily obscured. This irregular "bump or hump" was about halfway between the crest of the hill and the point of impact, and the blind spot was "just north" of the "hump."

The plaintiff also called Trooper Roy Foss, who had participated in the investigation of the accident, and Trooper Foss, for the most part, corroborated Trooper Stephens' measurements and observations, and in addition he testified that at the point of impact there were double yellow lines on either side of the median line, placed there to warn a motorist that the view ahead "is obstructed and dangerous to pass" in. The witness also stated that the shoulder to the east of the place of collision was not straight down but is "rather steep," being two or three feet, and Trooper Foss was permitted to say that he would not consider it safe for a car going 50 to 55 miles an hour to turn off onto that shoulder.

This witness' description of the lay of the land was that a northbound motorist, traveling north from the crest of the hill, would go generally downslope "at a pretty good angle, and then, up over a small knoll, and then, down again and rather sharply up another hill." The downgrade from the crest of the hill, in other words, runs along gently for a short way and then becomes "rather a sharp drop in the road," and the two vehicles collided on the more abrupt grade. Trooper Foss, on the basis of his observation, testified that there was unobstructed level vision from the crest of the hill to the south to the crest of the knoll to the north, and being asked if there was any obstruction to one's vision from the crest of the hill north to the approximate point of impact, he answered that "the view ahead was not obstructed at that * * * point."

As tending to show the characteristics of the terrain, the plaintiff also offered the evidence of Mr. Charles Winston, a commercial photographer. So far as it is material here, Mr. Winston's testimony tended to confirm plaintiff's theory that an ap-proaching vehicle could be seen over the "hump" or irregularity in the downslope over which a northbound motorist would travel, and indeed one of Mr. Winston's photographs shows plainly that from the crest of the hill south of the point of impact, under daytime conditions, a northbound driver could see 420 feet ahead.

To establish the actual sequence of events, the plaintiff called her two party-opponents, Mr. Ralph Shomer and the appellant. Mr. Shomer (who has not appealed) testified that on the day in question he had been working in Arcadia, Kansas. Earlier in the evening, Mr. Shomer picked up his car at Mt. Vernon, where he had left it on his way to work. Before leaving Mt. Vernon, Mr. Shomer had drunk one beer at a "beer joint" and had "played a couple of games of shuffleboard." About 9:30 P. M., Mr. Shomer left Mt. Vernon, drove a short distance east on Highway 166, and turned south on Highway 39. Mr. Shomer's lights were working when he turned south on Highway 39, and on one occasion he dimmed his lights for an oncoming car and was able to return them to high beam. At the intersection of FF highway and Highway 39, however, Mr. Shomer dimmed his lights and "they went out" about "half mile or a mile" from the place of collision. After that, there were no lights at all on his vehicle.

Up to that point, Mr. Shomer had been traveling about 40 miles an hour, and he then slowed to "I imagine 20, 25 miles an hour." After the lights on his vehicle went out, Mr. Shomer was able to see 10 to 15 feet ahead of him. Another southbound automobile (the Buus car) overtook and passed Mr. Shomer, and since he had no lights on his own vehicle he undertook to increase his speed so he could follow the Buus vehicle a short distance and turn onto a nearby crossroad. It was then, as he could "just barely" see the taillights of the Buus vehicle ahead, that "there was just four bright lights and that is the last thing I remember." Mr. Shomer was then going 15 or 20 miles an hour and said that he

"* * * was on the right side of the road at first, and then, I got blinded and I didn't know where I was at." Mr. Shomer's estimate of the distance between him and Mr. Jones' oncoming car, as the lights shone on him and blinded him, was 100 feet, although he qualified this estimate during the course of his examination by saying that he really "didn't know" how far the Jones headlights were from him when he was blinded. Mr. Shomer was unable to estimate Mr. Jones' speed because "it all happened so quick." Mr. Jones' headlights were not dimmed from the time he saw them until the cars collided, and Mr. Shomer stated he had seen a reflection from the Jones lights before they were "turned in [his] eyes." Mr. Shomer testified that he had no conscious memory of anything which occurred after he was blinded by the lights. It is conceded that Mr. Shomer sustained serious injuries in the accident.

On cross examination, it was brought out that Mr. Shomer had entered a plea of guilty to the charge of manslaughter in connection with this casualty, and that the information to which he had pleaded contained the allegation that he had driven his vehicle on the left side of the highway at a place where the view ahead was obstructed, without lighted headlamps. It was shown also that Mr. Shomer had received a sentence of two years' probation upon his plea of guilty. In response to further questions, Mr. Shomer stated that he had been "completely blinded," and that "when I got blinded, I must have turned to the left," but he could not remember turning either right or left.

Mr. Jones testified that on the occasion in question he was returning from a fishing trip at a nearby lake. He had begun this return trip about 8:00 P. M. and was driving a relatively new automobile in good mechanical condition. Mr. Jones said that the car was equipped with multiple-beam headlights, which show four lights when on bright and two when on low beam. These lights were in good condition and working properly at the time of the collision. The weather was clear and dry. When Mr. Jones first saw the Shomer vehicle it was completely on the east half of the roadway, moving straight to the south. Mr. Jones' lights were on bright at the time of collision.

Before meeting the Shomer car, Mr. Jones met another vehicle (the Buus car) going south, with its headlights on. When he met this car, Mr. Jones dimmed his lights, and "just as I met and passed it, I put my lights back on bright." Mr. Jones "then saw this other [Shomer] car coming towards me." Mr. Jones was then on a downslope, going down, and the Shomer car was "approximately 125 to 150 feet" away. Jones was going 50 to 55 miles an hour, and he applied his brakes. In his judgment, the Shomer car had been 160 to 170 feet behind the Buus car when he first saw Shomer.

Defendant Jones adduced evidence from the occupants of the Buus car, including James Buus, 21, the driver of the vehicle. On the occasion in question, Mr. Buus, his brother, and a Mr. Bill Wright were driving south in a 1957 Chevrolet two-door "hardtop." When Mr. James Buus first saw the Shomer vehicle it was traveling in the right lane, or the "southbound side." The lights (on the Shomer car) "were out." Mr. Buus was going about 40 miles an hour, and he passed Mr. Shomer north of the junction of Highway 39 and FF, "somewhere along by the new ranch-type house on the right side of the road. * * *" As he passed the Shomer car, Mr. Buus' brother called out, "[T]urn your lights on." After he passed Mr. Shomer, Mr. Buus started speeding up and was going 65 miles an hour when the casualty occurred. Mr. Buus actually saw the collision, stating that he "seen it in the mirror," "seen the cars hit and go up." Mr. Buus would estimate that, as he met Mr. Jones, Shomer was "around 100 feet" behind him, and when Buus glanced in his rearview mirror Shomer was "on the left side as you are traveling south." Mr. Buus "wasn't to the top of the hill whenever we [Buus and Jones]

met." Mr. Buus estimated that "it couldn't have been" as long as three or four seconds between the time he met Mr. Jones and the moment of impact, and stated that "it wasn't total darkness" because there was a moon out that night. Mr. Buus could not recall whether Mr. Jones had dimmed his lights or not. With some variation not material here, the other two occupants of the Buus vehicle related the facts substantially as Mr. James Buus testified. Mr. Wright estimated that Mr. Shomer was only 50 to 75 feet behind the Buus vehicle, while Mr. Buus' brother would "say about 150 feet"; Mr. Buus' brother was able to say definitely that Mr. Jones' lights were on high beam when he first saw Jones, and he fixed the point where the Buus vehicle passed Mr. Jones as being three-quarters of the way up the hill.

■ In our view, the merits of this appeal turn on the question whether the plaintiff's proof, granting it the most favorable intendment, establishes a causal connection between the appellant's breach of duty— failure to dim his lights or turn aside— and the injuries sustained. It is true enough that there is a primary duty to dim or deflect dazzling headlights, and generally, in cases involving a breach of that duty, the question of causation, upon conflicting evidence, has been held to be a matter for the trier of fact. Robb v. Wallace, Mo., 371 S.W.2d 232, 235 [1–3]; Anno., 22 A.L.R.2d 427, 429–430 (1952). Nevertheless, it is recognized in those cases, as in others involving negligence, that a breach of duty is not actionable unless a causal connection is established between the negligent act and the injury, Fuller v. Baxter, Mo.App., 284 S.W.2d 66, 68 [2, 3], and if the casualty was inevitable even if the defendant had dimmed his lights—in a word, if the accident would have happened anyway—there can be no recovery. Garey v. Anco Manufacturing & Supply Co., 8 Cir., 221 F.2d 683, 687 [1, 2]; Southeastern Liquid Fertilizer Co. v. Mock, 92 Ga.App. 270, 88 S.E.2d 531, 532 [1]; Barton v. State Farm Mutual Automobile Ins.

Co., La.App., 158 So.2d 375, 376; Brock v. Robinson, 97 N.H. 334, 88 A.2d 306, 307 [1]. We think this is true whether the negligence submitted here is regarded as primary or humanitarian negligence, for the familiar chant of the humanitarian ritual requires that there be "time thereafter," Massman v. Kansas City Pub. Serv. Co., Mo., 119 S.W.2d 833, 836; Byrnes v. Poplar Bluff Printing Co., Mo., 74 S.W.2d 20, 26, and the humanitarian plaintiff must establish by substantial evidence that after the humanitarian duty arose the defendant yet had time and space available in which to avoid the casualty. Moore v. Ervin, supra, 374 S.W.2d at 149 [3, 4]; Yeaman v. Storms, 358 Mo. 774, 778–779, 217 S.W.2d 495, 498–499 [2]; Hampton v. Raines, Mo. App., 334 S.W.2d 372, 376–377 [3, 4].

It is precisely in this respect that we believe the plaintiff's case fails against the appellant. Because the trial court's order was based on a discretionary ground, we are reluctant to set it aside, and we have therefore set forth and examined the evidentiary detail of this case at some length. However, upon the record presented, it is simply not established by substantial evidence that the appellant could, or in the exercise of the highest degree of care should, have seen the Shomer car sooner than he actually saw it, by which time "the possibility of salvation [was] too clearly foreclosed," 2 Harper & James, Torts, Section 20.2, pp. 1113–1114 (1956), for the appellant's conduct to be regarded as a legal cause of the injury.

As a beginning point of reference, the plaintiff established that the appellant crossed the "crest" of a hill, traveling north at a speed of 50 to 55 miles an hour. Traveling south toward the appellant were, first, the Buus car, which he was meeting, and behind the Buus car—at least initially— the Shomer vehicle, which was wholly without lights. The contour of the highway over which the vehicles were traveling was described by the witnesses as being downgrade, but unevenly so, and as a motorist traveled north, as appellant did, he

went first gently downgrade from the crest of the hill, then over a slightly elevated hump in the downgrade, and then more sharply downslope to the point of collision, which was about 279 feet south of the highest point of elevation, or the "crest." By means of photographic exhibits, it was established that under *daytime* conditions the top of an automobile approaching the point of collision from the north could be seen 420 feet from the crest or highest point to the south. Both witnesses who helped investigate the accident testified that the uneven downward grade created a "blind spot" where a car would go out of sight as it approached from the north (as Shomer did), although one of them testified, again referring to daytime conditions, that the appellant had unobstructed level vision from the crest of the hill to the south to a knoll 531 feet to the north. The measurements and observations upon which this testimony was based were made, for the most part, in January 1964 in connection with the criminal prosecution against Mr. Shomer. Some of the photographs, of course, were made the day following the accident, and these photographs, together with the oral testimony, established that the point of collision was wholly in the east or northbound lane. Again, however, we emphasize that they are daytime photographs.

- The only testimony in the record concerning the positions of the Buus car and the Jones vehicle when they met on the downgrade comes from the occupants of the Buus vehicle. This testimony makes it appear that Jones had passed the crest of the hill and had started downgrade when he met and passed the Buus vehicle. The position of Mr. Shomer's vehicle (wholly unlighted) behind Buus at the time Buus and Jones met and passed is problematical, but the tenor and substance of Mr. Shomer's testimony, viewed most favorably to the plaintiff, is that he was attempting to follow the taillights of the Buus vehicle to an intersecting side road a short distance south of the place of collision. Though Mr. Shomer stated upon trial that he was

"on the right side at first and then * * * got blinded * * * and didn't know where [he] was at," the reasonable inference from the record is that as Jones, going north, met Buus, going south, Shomer was *behind* Buus attempting to follow him, though as we understand Mr. Shomer the implication of his testimony is that when the Jones lights shone on the Buus vehicle he was "blinded" by Jones' dazzling lights and then began to turn to his left. Mr. Shomer's estimate of the distance between him and Jones, when Jones' headlights first shone in his face, was 100 feet, although he substantially retracted this estimate later in the course of his examination.

The actual amount of illumination of the general area where the collision occurred is also a matter of speculation. Both Buus and Shomer testified to seeing Jones' approach from the south by reflected light, but Mr. Shomer testified that the night was so dark he could only see 10 to 15 feet ahead after his lights went out. Mr. Buus and his companions testified that there was enough reflected light for them to see Shomer to their rear (north) shortly before the accident occurred, and they attributed this illumination to the moon. Other evidence indicated that the moon did not rise that night until after the accident occurred.

Thus, we have a situation in which the appellant, with his lights on high beam, driving over hilly terrain at a lawful speed, meets an oncoming vehicle (presumably properly lighted), behind which there is another unlighted vehicle, at least initially, in a concealed position of danger While we know that rays of light coming from different sources (the appellant's headlights and those of the oncoming Buus vehicle) blend into a composite illumination, Lynch v. Missouri-Kansas-Texas R. Co., 333 Mo. 89, 97, 61 S.W.2d 918, 921, and it may have been that the appellant could or in the exercise of the highest degree of care should have seen Mr. Shomer before he passed the Buus car, there is nothing in

the record to show that Shomer should have become visible before Jones and Buus met and passed. Though the case law is somewhat ambiguous as to what perils a motorist must anticipate or foresee at a particular time, we believe that, in the circumstances presented, the presence of the Shomer vehicle upon the road without lights, either concealed or partially concealed behind the oncoming Buus car, was not within that class of risk which the appellant was bound to anticipate. Freightways, Inc. v. Stafford, 8 Cir., 217 F.2d 831, 836; Smith v. Producers Cold Storage Co., Mo.App., 128 S.W.2d 299, 304–305 [9]; Schofield v. Druschel, 359 Pa. 630, 59 A.2d 919, 922 [2–6]. And considering the hilly contour of the highway as well as Shomer's position on the road behind Mr. Buus, we can discover nothing in the record which would furnish the jury with any substantial basis for concluding that Shomer should have been visible before Buus was out of the way, so to speak. It is true enough that the plaintiff went to some length to establish the field of view which a northbound motorist would have without any other vehicle on the road, under daytime conditions, but we decline to accept this as proof of what the appellant should have seen under the conditions of illumination obtaining at the time the accident occurred. Nor can we rely upon the photographs taken under daytime conditions to establish the appellant's field of vision ahead at night, Scott, Photographic Evidence, Section 90, pp. 97, 102 (1942); see Freightways, Inc. v. Stafford, supra, 217 F.2d at 836–837 [8], and we decline to accept them as having any probative value in establishing that Mr. Jones should have seen the Shomer car sooner than he testified he actually saw it. To reiterate our conclusion, the testimony and proof presented furnished no substantial basis for a jury to find that Shomer was or should have been visible to Mr. Jones before he passed the Buus vehicle.

■ To discover, then, if sufficient time remained for effective action after Mr.

Shomer was discovered by the appellant, we are remitted to a consideration of the estimates of time and distance which appear in the record. We find it unnecessary to explore the appellant's argument that these estimates have the binding effect of admissions, since they were brought out through an examination of the appellant's adversaries as witnesses. Ordinarily, a party is not bound by his estimates of speed and distance, Fenneren v. Smith, Mo., 316 S.W.2d 602, 608, and we have simply considered here that the plaintiff was entitled to the "happiest and most favorable combination of facts which can be picked or inferred from the whole evidence * * *." Montgomery v. Petrus, Mo.App., 307 S.W. 2d 24, 27 [3, 4].

Considering the estimates of speed and distance most favorable to the plaintiff, we find Mr. Shomer testified that his "best judgment" was that Mr. Jones was 100 feet away when the lights of the Jones car first shone on him and blinded him. He later qualified this estimate so thoroughly that we hesitate to take it into account; at one point in his examination, Mr. Shomer stated that he really "[didn't] know" the distance. At another point, Mr. Shomer said that he was "totally blinded" when the oncoming (Jones) car "topped this crest," but we cannot judge the defendant's duty by this remark for, as we understand the record, the Buus car was still ahead of Mr. Shomer, and we cannot accurately say that Jones either saw or should have seen Shomer at that time.

The appellant, in describing the accident, said that when he "flashed his lights back up on high beam," after passing Mr. Buus, he saw the Shomer car 125 to 150 feet away, directly in front of him in the east lane. Jones was then going 50 to 55 miles an hour, and he applied his brakes, but the two cars collided head on. We can find no other estimate in the record which, realistically construed, allows the appellant further than 150 feet in which to act, at a speed of 50 miles an hour. Mr. Shomer's estimate of speed most favorable to the

plaintiff's case was that he was going 15 or 20 miles an hour.

■ As the Shomer car came into view, then, there were 150 feet left in which the appellant could act. The distance between the two vehicles was being closed at a combined speed of 65 miles per hour, or 95.4 feet per second. Assuming that the speed of the Jones car was only slightly diminished, as it appears to have been by Mr. Jones' braking effort, the distance between the two vehicles was closed in a little over 1.5 seconds, of which three-quarters of a second was consumed by Mr. Jones' reaction time. This simple calculation makes our conclusion plain: There is no substantial evidence establishing the essential fact that the appellant could have avoided the accident after he first saw the Shomer car in his headlights. In reaching this result, we have taken into consideration the testimony of Mr. Shomer that Mr. Jones' headlights were never dimmed at any time, although there was testimony to the contrary, and we have carefully searched the record for some estimate of speed and distance which could be reasonably construed as allowing the appellant more time in which to act. Our conclusion is that we must, and we do, hold that no submissible case was made against the appellant, either upon primary or humanitarian negligence. Moore v. Ervin, supra, 374 S.W.2d at 149 [3, 4]; see Hampton v. Raines, supra, 334 S.W.2d at 376–377 [3, 4]. For that reason, the order granting a new trial to the appellant was erroneous, and we so rule.

The appellant has also assigned error to the trial court's ruling granting plaintiff a new trial as against his co-defendant, though Mr. Shomer has made no complaint of the judgment rendered against him and has not attempted to appeal. We find it unnecessary to consider whether the appellant has the right to appeal from the order granting plaintiff a new trial as against his co-defendant, see Stutte v. Brodtrick, Mo., 259 S.W.2d 820, 823 [1];

White v. Kuhnert, Mo.App., 207 S.W.2d 839, 841 [3], for in view of what we have said, the appellant could in no event be held liable. Our conclusion is that the verdict of the jury in favor of the appellant should be reinstated, and held in abeyance until after the new trial as to defendant Shomer. A new judgment should then be entered. Neal v. Curtis & Co. Manufacturing Co., 328 Mo. 389, 419, 41 S.W.2d 543, 557 [30, 31]. It is so ordered.

RUARK, P. J. and STONE, J., concur.